John Lewis PIERSON, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 75–218.

United States District Court, D. Delaware.

April 24, 1979.

**958**

Charles S. Crompton, Jr., Potter, Anderson & Corroon, Wilmington, Del., James S. Eustice, Stephen D. Gardner and Max Folkenflik, Kronish, Lieb, Shainswit, Weiner & Hellman, New York City, John H. Schafer and Charles Lister, Covington & Burling, Washington, D. C., for plaintiff.

James W. Garvin, Jr., U. S. Atty., and John H. McDonald, Asst. U. S. Atty., Dept. of Justice, Wilmington, Del., Carr M. Ferguson, Asst. Atty. Gen., John J. McCarthy and D. Patrick Mullarkey, Dept. of Justice, Gerald Backer, Hu S. Vandervort, Theodore J. Kletnick and Michael J. Cooper, Internal Revenue Service, Washington, D. C., for defendant.

OPINION

MURRAY M. SCHWARTZ, District Judge.

The plaintiff in this action, John Lewis Pierson, is one of over 17,000 former shareholders of the Hartford Insurance Company ("Hartford") who exchanged their Hartford stock for shares of the International Telephone and Telegraph Corporation ("ITT") Series N voting convertible preferred stock, pursuant to an exchange offer made by ITT in 1970. Mr. Pierson contends that this exchange offer qualified as a tax-free reorganization under Sections 354(a)(1) and 368(a)(1)(B) of the Internal Revenue Code of 1954.[1] Having determined that the exchange offer did not so qualify, the Internal Revenue Service treated the exchange as a taxable event, and it assessed and collected from the plaintiff for the year 1970 $3,683 in taxes and interest attributable to the Hartford-ITT exchange. The plaintiff presently seeks a refund of that amount. The matter is now before the Court on plaintiff's motion for summary judgment, which for the reasons articulated in this opinion will be granted.

## I. FACTUAL BACKGROUND

■ The tax liability of the shareholder who exchanges his stock in one corporation for that of another must be determined with reference to a statutory scheme that looks to the conduct of the two corporations in deciding whether the exchange of shares is a taxable event upon which the taxpayer must recognize gain or loss. Therefore, the facts relevant to plaintiff's motion involve the dealings between Hartford and ITT that ultimately led to the May, 1970 exchange offer.

ITT first expressed an interest in merging with or acquiring Hartford Insurance Company in 1968, by initiating a series of meetings to discuss these possibilities and by contemporaneously entering negotiations

---

**1.** 26 U.S.C. § 354(a)(1) and 368(a)(1)(B). *See* note 3, *infra.* Unless otherwise noted, all references are to the 1954 Code.

to acquire an available six-percent block of Hartford stock. Although Hartford rejected the proposal of an immediate merger in favor of pursuing its own plan for corporate acquisition and expansion, it was apparently agreed that the way would be left open for a future merger, and the possibility of interim joint ventures was discussed.

Subsequently, on November 19, 1968, ITT consummated the purchase of the six-percent block of Hartford voting stock (1,282,-948 shares) from a mutual fund managed by Insurance Securities Inc. ITT also made open market purchases of 458,000 shares of Hartford stock between November 12, 1968 and January 10, 1969, and it purchased 400 Hartford shares on March 13, 1969 from an ITT subsidiary. Through these purchases, all made for cash, ITT succeeded in acquiring approximately eight percent of Hartford's voting stock.

In December, 1968, ITT formally expressed its interest in affiliating with Hartford by proposing merger terms that called for the exchange of one share of ITT's $2 Cumulative Convertible Preferred Stock for each outstanding share of Hartford's stock. Although this initial proposal was rejected, on April 9, 1969, the two companies provisionally entered into a plan and agreement of merger providing for the merger of Hartford into a wholly owned subsidiary of ITT. The merger was subject to the approval of the shareholders of both companies and to that of the Connecticut Insurance Commissioner as required by state law, and it reserved to Hartford the absolute right to terminate the agreement in the event that it viewed as imminent any action by the Antitrust Division of the Department of Justice to enjoin the proposed merger. Although such litigation was in fact commenced in August, 1969, Hartford's board of directors decided to proceed with the merger, and in October, 1969 the Antitrust Division's motion for a preliminary injunction was denied by the United States District Court for the District of Connecticut.

On October 13, 1969, in response to a request for a private letter ruling, the Internal Revenue Service ruled that the proposed merger of Hartford and ITT would be a tax-free reorganization within the meaning of Section 368(a)(1)(B)[2] provided only that ITT make an unconditional disposition of the Hartford stock it had previously acquired for cash. On October 21, 1969, the Commissioner ruled that a proposed sale of the stock to Mediobanca, an Italian bank, would constitute such an unconditional disposition, and this sale was ultimately consummated.

On November 10, 1969, after termination of the antitrust litigation and after the Internal Revenue Service had assured tax-free treatment of the merger, the Hartford shareholders approved the transaction, which previously had been approved by the ITT shareholders on June 26, 1969. The one remaining approval necessary to the merger, however, was not to be forthcoming. On December 13, 1969, the Connecticut Insurance Commission withheld its imprimatur, apparently out of concern that dissenting Hartford shareholders would have only limited rights under the proposed plan of merger.

Hartford and ITT then proposed to accomplish the amalgamation by means of an exchange offer to the Hartford shareholders on essentially the same terms that they would have received if the merger had been effected. The principal difference between the two arrangements was that under the exchange offer, a stock-for-stock exchange was substituted for the merger, which had the effect of affording those Hartford shareholders who objected to the amalgamation or to owning ITT shares the right to withhold tender of their Hartford stock. The withheld shares would not be subject to automatic conversion into ITT stock as an-

---

**2.** This initial merger proposal would have resulted in a "reverse (B) merger," under which a newly created subsidiary of ITT would have merged into Hartford, whose shareholders would have received ITT voting stock for their shares. Hartford would have been the surviving entity as a wholly owned subsidiary of ITT, and the brief existence of the ITT subsidiary would have been ignored for tax purposes. *See* Rev.Rul. 67–448, 1967–2 C.B. 144.

ticipated by the original merger agreement. After three days of hearings before the Connecticut Insurance Commission in March, 1970, in which ITT made certain commitments concerning the post-acquisition operation of Hartford, the Insurance Commissioner approved the proposed plan, and on May 26, 1970, ITT submitted the exchange offer to all Hartford shareholders. By June 8, 1970, over ninety-five percent of the Hartford shares had been tendered, including those held by the Italian bank, as well as those owned by the plaintiff in this action.

In March of 1974, the Internal Revenue Service retroactively revoked its ruling that had approved ITT's sale of those Hartford shares previously acquired for cash. The Service based its revocation on the grounds that the request upon which the private letter ruling was premised had misrepresented the actual nature of the sale to Mediobanca. As a consequence, the Service concluded that the entire transaction no longer fell within Section 368(a)(1)(B), and it assessed tax deficiencies against the former Hartford shareholders (including the plaintiff) who had accepted the exchange offer ·and filed returns treating the transaction as a tax-free reorganization.

## II. CONTENTIONS OF THE PARTIES

In this suit for refund of the additional taxes paid after the Internal Revenue Service revoked its prior ruling, the plaintiff proposes to challenge (if necessary) both the substantive and procedural propriety of

that revocation. For the purposes of this motion for summary judgment, however, the plaintiff asks the Court to assume that the Hartford shares previously acquired for cash were never sold to Mediobanca, and he contends that he is nevertheless entitled to judgment under two separate and independent theories. Plaintiff first urges that the "reorganization" relevant to determining whether his exchange of stock requires the present recognition of gain or loss is the "reorganization" accomplished pursuant to the exchange offer plan that was developed in 1970 after the Connecticut Insurance Commissioner disapproved the proposed merger. Under this view of the transaction, the requirements of Section 354(a)(1) and Section 368(a)(1)(B) are fully satisfied,[3] because there were no cash purchases in the 1970 exchange offer to "taint" that transaction and to violate the "solely" requirement of Section 368(a)(1)(B). The Commissioner, on the other hand, contends that the plan of reorganization includes all of ITT's acquisitions of Hartford stock undertaken with the intent of acquiring Hartford, and that therefore the cash purchases in 1968 and 1969 were part of the plan and disqualify it from tax-free status under the Code. It is unnecessary to resolve the parties' dispute concerning what events constituted the "plan of reorganization," because the Court is convinced that the plaintiff is entitled to recover on the strength of his alternative argument.

In his second theory plaintiff concedes, solely for the purposes of this motion, that

---

**3.** Section 354(a)(1) provides:

No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization áre, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization. Section 368(a)(1)(B) defines a reorganization of the type relevant in this case as follows:

(a) Reorganization.—

(1) In general.—For purposes of parts I and II and this part, the term "reorganization" means—

\* \* \* \* \* \*

(B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is

in control of the acquiring corporation), of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation (whether or not such acquiring corporation had control immediately. before the acquisition); . . . .

The term control is defined in Section 368(c) as follows:

(c) Control.—For purposes of Part I (other than Section 304), part II, this part, and Part V, the term "control" means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation.

ITT's cash purchases of stock in 1968 and 1969, along with the 1970 exchange offer, may be viewed as a single transaction, but argues that such a view does not defeat his claim for tax-free status under Section 354(a)(1). Plaintiff urges that at least where eighty percent of the stock of the acquired corporation is exchanged for voting stock in the acquiring corporation, the literal requirements of Section 368(a)(1)(B) are met and the presence of nonstock consideration (or "boot") in the same transaction will not preclude its qualifying as a reorganization. In the ITT-Hartford transaction, it is undisputed that over eighty percent of the Hartford stock was acquired by ITT pursuant to the exchange offer and without the payment of any cash.[4] Mr. Pierson argues that under the rule he urges this Court to adopt, the Hartford-ITT transaction constituted a reorganization within the meaning of Section 368(a)(1)(B), and that because he exchanged stock solely for stock pursuant to the plan of reorganization, the exchange should qualify for nonrecognition under Section 354(a)(1).

The question posed for this Court's decision by the plaintiff's second contention is whether the "solely" requirement of Section 368(a)(1)(B) dictates that the entire transaction in which control of another corporation is acquired be completely free of boot, or whether the word "solely" applies only to that quantity of stock necessary to transfer control and permits the presence of boot in the transaction so long as control is acquired solely for voting stock.[5] Although the latter interpretation has not received wide-spread acceptance, or indeed been adopted by any court until quite recently,[6] I conclude that it is the correct view of the Section 368(a)(1)(B) "solely" requirement and that therefore the plaintiff is entitled to recover.

## III. THE IMPACT OF PRIOR CASES
### A. The Decisions

The question whether the presence of boot in a transaction vitiates its status as a tax-free (B) reorganization has been squarely addressed in nine separate opinions emanating from the United States Tax Court, the Board of Tax Appeals, the Court of Claims, and the Ninth, Seventh, Fifth and Second Circuit Courts of Appeals.[7]

4. The 1970 exchange offer prompted the tender of over 95% of the outstanding Hartford stock, including the approximately 8% that was owned by the Italian bank but which must for the purposes of this motion be viewed as owned by ITT. Subtracting that 8% from the 95% total figure, it is clear that over 80% of the Hartford stock was exchanged solely for ITT voting stock.

5. As the Court must view the facts of the present case, control of the acquired corporation—that is, over 80% of its outstanding stock—was acquired in a single transaction, in which cash was paid for another 8% of the stock. This Court, therefore, has no occasion to consider the effect of cash in a transaction where control is acquired by the "creeping control" method. Since the 1954 Amendments to the Internal Revenue Code, a corporation may, for example hold stock in the acquired corporation that is "old and cold," (regardless of what type of consideration was paid for it) and may then seek to qualify as a reorganization under § 368(a)(1)(B) a transaction in which it purchases solely for voting stock sufficient shares of the acquired corporation to gain control within the meaning of § 368(c) but in which cash is paid for additional shares. The question whether such a transaction would be tax-

free is not posed for decision, and this Court does not understand plaintiff to be contending for a rule that is necessarily broad enough to assure nonrecognition of gain or loss on these hypothetical facts. See note 61, infra.

6. The plaintiff's view of the solely requirement was recently adopted by a divided United States Tax Court in Reeves et al. v. Commissioner of Internal Revenue, 71 T.C. 727, a case involving the Hartford-ITT merger and presenting for decision questions identical to those currently before this Court.

7. The nine opinions, involving seven cases, are as follows: Pulfer v. Commissioner, 43 B.T.A. 677 (1941); Commissioner v. Air Reduction Co., Inc., 130 F.2d 145 (2d Cir.), cert. denied, 317 U.S. 681, 63 S.Ct. 201, 87 L.Ed. 546 (1942); Hubert E. Howard, 24 T.C. 792 (1955); Howard v. Commissioner, 238 F.2d 943 (7th Cir. 1956); Commissioner v. Turnbow, 286 F.2d 669 (9th Cir. 1960), aff'd, 368 U.S. 337, 82 S.Ct. 353, 7 L.Ed.2d 326 (1961); Richard M. Mills, 39 T.C. 393 (1962); Mills v. Commissioner, 331 F.2d 321 (5th Cir. 1964); Lutkins v. United States, 312 F.2d 803, 160 Ct.Cl. 648, cert. denied, 375 U.S. 825, 84 S.Ct. 65, 11 L.Ed.2d 57 (1963); and Reeves v. Commissioner, 71 T.C. 727.

Eight of those opinions have expressly answered that question affirmatively. In an opinion filed February 6, 1979, which arguably reverses its prior position,[8] the United States Tax Court has held that where "80 percent or more of the stock of a corporation is acquired in one transaction, in exchange for which only voting stock is furnished as consideration, the 'solely for * * voting stock' requirement of section 368(a)(1)(B) is satisfied." *Reeves v. Commissioner*, 71 T.C. 727 at 741. The plurality opinion in *Reeves* views the prior cases deciding this question as factually distinguishable, and this Court agrees in substantial measure with that conclusion. Nevertheless, because the cases prior to *Reeves* purport to announce or rely upon a rule that would be broad enough to govern the present case, some discussion of these decisions is warranted. This opinion will briefly outline the holdings and rationales of the prior cases, before analyzing their precedential value. First, however, it is necessary to understand the teachings of *Helvering v. Southwest Consolidated Corp.*, 315 U.S. 194, 62 S.Ct. 546, 86 L.Ed. 789 (1942), in which the Supreme Court—which has never confronted the precise issue here presented—announced a rule that has formed the analytic cornerstone for the cases absolutely excluding boot from a (B) reorganization.[9]

The *Southwest Consolidated* case arose under Section 112(g)(1)(B) of the Revenue Act of 1934—the predecessor statute of Section 368(a)(1)(B)—which treated as a tax-free reorganization

the acquisition by one corporation in exchange solely for all or a part of its voting stock: of at least [eighty] per centum of the voting stock and at least [eighty] per centum of the total number

of shares of all other classes of stock of another corporation; or of substantially all the properties of another corporation;

. . .

The 1934 Act thus treated identically acquisitions accomplished by stock-for-stock exchanges ("stock acquisitions") and those accomplished by stock-for-asset exchanges ("asset acquisitions"), and it provided for their tax-free status in a single statutory subsection. The taxpayer in *Southwest Consolidated* had acquired substantially all of the assets of another corporation in exchange for stock, warrants and cash—the nonstock consideration constituting about thirty-seven percent of the assets' fair market value.[10] In rejecting the taxpayer's contention that the transaction constituted a reorganization, a unanimous Supreme Court stated: "Congress has provided that the assets of the transferor corporation must be acquired in exchange 'solely' for 'voting stock' of the transferee. 'Solely' leaves no leeway. Voting stock plus some other consideration does not meet the statutory requirement." 315 U.S. at 198, 62 S.Ct. at 550.

The *Southwest Consolidated* holding was promptly used to support by analogy the decision of the Second Circuit in *Commissioner v. Air Reduction Co., Inc.*, 130 F.2d 145 (2d Cir.), *cert. denied*, 317 U.S. 681, 63 S.Ct. 201, 87 L.Ed. 546 (1942), that the presence of boot would vitiate the tax-free status of a stock acquisition. The Court's treatment of the reorganization question consists in its entirety of the following passage:

Finally the taxpayer urges that, in the exchange by which the Pure Carbonic Company stock was acquired, no taxable gain could result because there was a

---

8. *Reeves, supra,* 742, (Scott, J., concurring).

9. One of the cases holding "solely" to exclude all boot in a (B) reorganization was decided prior to *Southwest Consolidated*, but engaged in no analysis and cited no support for its holding. *Pulfer v. Commissioner*, 43 B.T.A. 677 (1941). This case has been sparsely cited in subsequent opinions and is viewed as rather weak support for the rule here urged by the Commissioner. The dissenting opinion in

*Reeves*, for example, did not see fit to rely upon it.

10. The Supreme Court's disposition of the taxpayer's claim in *Southwest Consolidated* obviated any need for the Court to determine what percentage of the assets were acquired for something other than voting stock, but the Tax Court's calculation of the percentage may be found in *Reeves, supra,* 735, n.8.

non-taxable reorganization. But this theory is not tenable because the definition of reorganization in § 112(g)(1)(B) of the 1934 Act, 26 U.S.C.A. Int.Rev. Acts, page 695, contemplates only situations where the exchange is made "solely" for voting stock. Here over 17% of the Pure Carbonic stock was purchased for cash. Cf. *Helvering v. Southwest Consolidated Corp.*, 315 U.S. 194, 62 S.Ct. 546, 86 L.Ed. 789.[11]

As suggested by the brevity of this discussion, the reorganization issue in *Air Reduction* was a relatively minor one, that had not even been argued to the Board of Tax Appeals,[12] and the question was largely overshadowed by the Court's concern with the tax consequences of the sale of treasury shares.

Although the leap of logic necessary to analogize the *Southwest Consolidated* holding concerning asset acquisitions to cases dealing with stock acquisitions was arguably reasonable in view of the 1934 Act's treatment of stock and asset acquisitions in the same subsection, the analogy was perpetuated in decisions following the enactment of the Revenue Act of 1939. Section 112(g)(1) was amended in 1939 to distinguish between stock and asset acquisitions as follows:

> The term "reorganization" means
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (B) the acquisition by one corporation, in exchange solely for all or part of its voting stock of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation, or (C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by

the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded, .　.　..

The effect of boot in a stock acquisition under the amended Section 112(g)(1) was first addressed by the Tax Court in *Hubert E. Howard*, 24 T.C. 792 (1955), in which the taxpayer contended

> that the acquisition by one corporation of at least 80 per cent of the only class of stock outstanding of another corporation for stock is an acquisition "solely" for stock within the meaning of the definition of a reorganization under section 112(g)(1)(B) and qualifies as a tax-free exchange to that extent under section 112(b)(3), regardless of other consideration given by the transferee corporation for additional stock in excess of the minimum requirement of 80 per cent.[13]

The transaction at issue in *Howard* involved the exchange of 81.19 percent of all outstanding Binkley Company stock in exchange for Truax-Traer Company voting stock, and the payment of cash for the remaining Binkley shares. In rejecting the taxpayer's argument—identical to the one here presented and urged in a case involving facts quite similar to the present ones— the Tax Court viewed the question as already settled adversely to the taxpayer. The Court reached this conclusion by relying on four principal cases: *Southwest Consolidated, supra, Air Reduction, supra,* and two Court of Appeals decisions affirming memorandum opinions of the Tax Court in cases involving asset acquisitions.[14]

When the Seventh Circuit Court of Appeals was called upon to review the decision of the Tax Court in the *Howard* case, the court likewise placed its complete reliance upon *Southwest Consolidated* and *Air Reduction,* but, before doing so, undertook

---

11. 130 F.2d at 148.

12. *See* 1941 B.T.A.M. (P–H) ¶ 41,266 at 41–552 (1941).

13. 24 T.C. at 803.

14. The two cases are *Commissioner v. Pressed Steel Car Co.*, 152 F.2d 280 (3d Cir. 1945), a summary affirmance of the Tax Court opinion, and *Central Kansas Telephone Co. v. Commissioner*, 141 F.2d 213 (10th Cir. 1944), an opinion resting solely on the authority of *Southwest Consolidated.*

what appears to be the first reported effort to find support in the legislative history of Section 112(g)(1) for the identical treatment of boot in stock and asset acquisitions. *Howard v. Commissioner,* 238 F.2d 943, 945–47 (7th Cir. 1956). The Seventh Circuit concluded that "insofar as the 'solely' requirement is concerned, the two types of transactions should be treated the same," [15] and in support of this conclusion the court derived two points from an examination of the Senate Finance Committee Report issued prior to the enactment of the 1934 Code.[16] First, the Seventh Circuit noted that the Committee perceived a purpose in the granting of tax-free status that was common to both stock and asset acquisitions, because the Committee viewed both these transactions as sufficiently similar to statutory mergers and consolidations as to be entitled to similar nonrecognition treatment.[17] Second, the Seventh Circuit found significance in the following passage in the Senate Report:

> It will be noted that the proposed amendment requires that (1) the acquiring corporation must obtain at least 80 percent of the voting stock * * * of the other corporation, * * * and (2) the acquisition, *whether of stock or of substantially all the properties,* must be in exchange solely for the voting stock of the acquiring corporation. (Emphasis supplied by the *Howard* Court.)[18]

The Court viewed this passage as conclusively establishing that no distinction was to be made between stock and asset acquisitions with respect to the "solely" requirement, and upon this premise, the Seventh Circuit viewed *Southwest Consolidated* as controlling both stock and asset acquisitions.

The "solely" requirement in (B) reorganizations was also given extensive discussion by the Ninth Circuit in *Commissioner v. Turnbow,* 286 F.2d 669 (9th Cir. 1960), *aff'd,* 368 U.S. 337, 82 S.Ct. 353, 7 L.Ed.2d 326 (1961).[19] There the Court considered whether, in the absence of a (B) reorganization, a taxpayer was entitled to have his gain or loss recognized only to the extent of the cash he received in an exchange of stock for both cash and stock consideration. In *Turnbow,* there was no possible argument that the transaction involved constituted a reorganization under Section 112(g)(1)(B) of the 1939 Code, because the voting stock exchanged constituted only about thirty percent of the consideration paid for the acquired corporation. The Ninth Circuit, nevertheless, approached the issue by analyzing the "solely" requirement in both (B) and (C) reorganizations, concluding that the legislative history compelled a view that no cash was permissible in a (B) reorganization. The Court then reasoned that this limitation would be rendered meaningless if a taxpayer could derive the benefits of Section 112(c)(1)[20] and limit his recognition of gain even though there was no qualifying reorganization to remove the transaction from the general rule mandating recogni-

**15.** 238 F.2d at 946.

**16.** S.Rep. No. 558, 73d Cong., 2d Sess. 16–17 (1934).

**17.** Statutory mergers and consolidations acquired tax-free status in § 112(g)(1)(A). The Committee Report viewed stock and asset acquisitions as functionally identical to statutory mergers and consolidations, and it recommended the intention of (B) and (C) reorganizations provisions

> in order to bring about a more uniform application of the provisions in all 48 of the States. Not all of the States have adopted statutes providing for mergers or consolidations; and, moreover, a corporation of one State cannot ordinarily merge with a corporation of another State. The Committee be-

lieves that it is desirable to permit reorganizations in such cases, . . .
*Id.* at 16.

**18.** *Id.* at 17.

**19.** The Supreme Court's affirming opinion did not discuss the issue here presented, and in fact appears expressly to have reserved it. *See* text accompanying notes 28–30, *infra.*

**20.** This section operated to permit a taxpayer who exchanged stock pursuant to a plan of reorganization, but who received both stock and nonstock consideration, to recognize gain or loss only to the extent of the value of the non-stock consideration. Section 112(c)(1) of the 1939 Code is now embodied in § 356(a)(1).

tion of gain on the exchange of stock.[21] The Ninth Circuit's examination of the legislative history did not, of course, seek to justify a strict interpretation of the "solely" requirement as compared to a rule permitting up to twenty percent nonstock consideration in such a transaction, but rather was aimed at demonstrating that there was *some* limitation on the presence of boot. In concluding that this limitation was an absolute one, the Court relied upon the Senate Finance Committee Report emphasized by the *Howard* court,[22] and upon the analogous holding in *Southwest Consolidated*.

In *Richard M. Mills*, 39 T.C. 393 (1962), the Tax Court again affirmed the rule absolutely prohibiting boot in stock-for-stock acquisitions. There all of the stock of the acquired corporations,[23] was exchanged for voting stock in the acquiring corporation, but a small amount of cash was also paid to compensate the shareholders of the acquired corporation for the fractional shares of voting stock in the acquiring company to which they would have been entitled. The cash payments constituted less than one-tenth of one percent of the fair market value of the acquired corporation's stock, and therefore well over eighty percent of that stock was purchased for voting stock in the acquiring corporation. The Tax Court rejected the taxpayers' contention that the boot involved in the *Mills* transaction was *de minimus* and concluded that "solely" meant "precisely what it purports to mean, namely that the receipt by the stockholders of an acquired corporation of any consideration whatsoever other than voting stock forbids a transaction from being a reorganization as defined under section 368(a)(1)(B)."[24] The Court believed that Congress' use of the words "substantially all" in Section 368(a)(1)(C) when specifying

the requirements of a (C) reorganization demonstrated that Congress was capable of "expressing a grant of leeway when that was its purpose."[25] Furthermore, the Court feared that adopting a rule permitting the transfer of some boot in a (B) reorganization to be viewed as *de minimus* would require parties structuring a transaction to guess how much cash would be acceptable to a reviewing court, and would therefore frustrate the desired goal of assuring the predictability of tax consequences in business transactions.

When the *Mills* case came before the Fifth Circuit, that Court likewise refused to adopt a *de minimus* rule, but nevertheless reversed the Tax Court, holding that the small amount of cash involved in the arrangement could not be viewed as consideration and therefore did not vitiate the transaction's tax-free status. *Mills v. Commissioner*, 331 F.2d 321 (5th Cir. 1964). Like the Tax Court, the Fifth Circuit assumed, upon the authority of *Southwest Consolidated*, that the "solely" requirement of Section 368(a)(1)(B) precluded the payment of any cash consideration in a (B) reorganization,[26] but, on the other hand, the taxpayers in *Mills* contended only for the application of a *de minimus* rule, and neither court was faced with the contention here advanced by the plaintiff that cash not exceeding twenty percent of the acquired corporation's value is permissible in an otherwise-qualifying (B) reorganization.

Finally, in *Lutkins v. United States*, 312 F.2d 803, 160 Ct.Cl. 648, *cert. denied*, 375 U.S. 825, 84 S.Ct. 65, 11 L.Ed.2d 57 (1963), the Court of Claims assumed that the holdings of *Southwest Consolidated* and *Howard* were settled law precluding the transfer of any cash consideration in a stock-for-

---

**21.** Section 112(a), I.R.C. of 1939.

**22.** *See* notes 16–18, *supra*, and accompanying text.

**23.** The transaction in *Mills* involved the acquisition of three small companies by one larger one.

**24.** 39 T.C. at 400. The 1954 recodification of the Internal Revenue Code renumbered, *inter alia*, the code provisions dealing with reorganizations, and what was previously § 112(g)(1) became § 368(a)(1).

**25.** 39 T.C. at 400.

**26.** Neither the Tax Court nor the Fifth Circuit opinions in *Mills* cited the *Howard* and *Air Reduction* cases.

stock reorganization. In *Lutkins* the plaintiffs sought to combine a 1912 exchange of stock with one that occurred in 1952 in order to meet the eighty percent control requirement. In the interim, however, the acquiring corporation had purchased for cash approximately 2.7 percent of the stock in the acquired corporation, in which the plaintiffs were stockholders. As this Court must do in the present case, the Court of Claims assumed for the purposes of its discussion that the transactions could be merged, but concluded that the cash purchases (which would logically have to be treated as part of the same transaction) would taint the alleged reorganization.[27]

### B. *Their Precedential Value*

In view of this line of cases, emanating principally from *Southwest Consolidated*, the Commissioner urges this Court to conclude, as did the *Lutkins* Court, that the rule absolutely precluding boot in a (B) reorganization is a settled one. Because this Court agrees with the view of Judge Scott, concurring, that the *Reeves* decision warrants the conclusion that the Tax Court has reversed its position on the "solely" issue, the existence of that opinion strongly undermines the Commissioner's argument. Furthermore, it is not at all clear that the Supreme Court would agree with the Commissioner's view of the law, as suggested by its decision in *Turnbow v. Commissioner*, 368 U.S. 337, 82 S.Ct. 353, 7 L.Ed.2d 326 (1961). In affirming the Ninth Circuit's holding[28] that a transaction not amounting to a reorganization under Section 112(g)(1)(B) could not trigger the non-recognition provision, Section 112(c)(1),[29] the court stressed that "[t]hat holding determines this case and is all we decide." 368 U.S. at 344, 82 S.Ct. at 357. Because the Seventh Circuit opinion in *Howard* was, in part, the source of the conflict that the Supreme Court sought to resolve when it decided *Turnbow*, and because both the *Howard* Court and the Ninth Circuit opinion in *Turnbow* discussed the meaning of the "solely" requirement at length, it may be reasonably concluded that the Supreme Court's quoted reference in *Turnbow* was intended expressly to reserve the issue *sub judice*.[30]

Furthermore, this Court cannot accept the view that the sheer number of cases purporting to decide the present issue (or to rely upon a rule contrary to that advanced by the plaintiff here) compels the conclusion that the principle of *stare decisis* operates to forbid the result reached today. As can be seen from the preceding review of the cases addressing this point, only three opinions have engaged in any substantive discussion of the statutory scheme, congressional purpose, or policy rationale arguably supporting a rule barring cash in (B) reorganizations. *Air Reduction* treated the issue as a subsidiary one and relied entirely upon *Southwest Consolidated*. The *Lutkins* court considered the matter governed by *Southwest Consolidated* as interpreted by the Seventh Circuit in *Howard*. The Tax Court opinion in *Howard* relied almost totally upon *Southwest Consolidated* and two other asset acquisition cases, without coming to grips with why the analogy between

---

27. This Court respectfully disagrees with the Tax Court opinion in *Reeves, supra*, 736, that the presence of the latent "step transaction" issue in *Lutkins* distinguishes it meaningfully from the facts of this case. If the various exchanges of stock in *Lutkins* are viewed as one transaction, the rule by the plaintiff urged herein would dictate a result opposite to that reached by the Court of Claims. On the other hand, if the step transaction doctrine would not permit such a merger, the issue sub judice would not even have been presented, because the last transaction in *Lutkins* transferred less than the 80% ownership in the acquired corporation required to bring the transaction within § 112(g)(1)(B) of the 1939 Code (under which

*Lutkins* was decided and which made no provision for acquisitions by the "creeping control" method; *see* text accompanying notes 45–47, *infra*).

28. See notes 19–22, *supra*, and accompanying text.

29. See note 20, *supra*.

30. *See Reeves, supra*, 738. *See also* Kanter, "Cash in a 'B' Reorganization: Effect of Cash Purchases on 'Creeping' Reorganization," 19 Tax L.Rev. 441, 447 & n.13 (1964) (hereinafter "Kanter").

stock, and asset acquisitions was appropriate, and the Fifth Circuit in *Mills v. Commissioner* likewise assumed this analogy without examining its propriety. Only the Tax Court opinion in *Mills*, the Seventh Circuit opinion in *Howard*, and the Ninth Circuit opinion in *Turnbow* attempt to present reasoned justifications for the "strict interpretation" of the "solely" requirement. For the purposes of evaluating their precedential import, it should be remembered that the present plaintiff's contention was apparently never argued to the Tax Court in *Mills*, and that the Seventh Circuit's reasoning in *Howard* and that of the Ninth Circuit in *Turnbow* have been called into question by the Supreme Court's language in *Turnbow*. Indeed, in its *Turnbow* brief to the Supreme Court, the Commissioner has conceded the questionable vitality of the *Howard* holding as it relates to the absolute prohibition of cash in (B) reorganizations.[31]

In accord with the Tax Court plurality opinion in *Reeves*,[32] this Court believes that the other opinions treating the issue presently before it placed too much reliance upon *Southwest Consolidated*, without sufficiently justifying its applicability to stock acquisitions. Furthermore, although the changes embodied in the 1954 Code to permit "creeping stock acquisitions" and the presence of twenty percent cash in (C) reorganizations modify the statutory context within which the "solely" requirement must be interpreted, only one of the decisions issued subsequent to that Code's enactment saw fit to discuss its implications.[33]

## IV. LEGISLATIVE HISTORY AND POLICY

Agreeing with the Supreme Court's conclusion in *Turnbow* that the legislative history of the reorganization provisions is "inconclusive, and no more can fairly be said of the Commissioner's Regulations,"[34] this Court is reluctant to assert that the recorded manifestations of legislative and administrative intent expressly warrant the adoption of the rule urged by plaintiff herein. The Tax Court in *Mills*, the Ninth Circuit in *Turnbow*, and the Seventh Circuit in *Howard*, however, considered the sources sufficiently revealing of Congress' plan to support a contrary result. I respectfully conclude that the analysis and holdings found in those three opinions were in some respects faulty, and that the legislative scheme in no way compels the result reached in those cases and in many respects—not addressed in the foregoing opinions—supports the result this Court reaches today.

---

31. As the Tax Court concluded in *Reeves*, it is appropriate to set forth in full the Commissioner's position concerning *Howard's* remaining import:

It cannot be said with certainty, for that matter, that there could not be "other property" in a transaction qualifying as a "B" or "C" reorganization. While those definitions do literally require that "solely * * * voting stock" be given, that requirement raises questions of interpretation (not involved in this case) that have not yet been finally resolved. For example, since § 112(g)(1)(B) requires only that 80% of the stock of another corporation be acquired, it is arguable that the definition is met if the consideration allocable to at least 80% of the stock consists of voting stock, notwithstanding that the acquiring corporation also acquires additional shares (e. g., from dissenting stockholders) for money or other property. That was in fact the situation in the *Howard* case, in which the acquiring corporation gave solely voting stock for 81% of the shares but gave cash to a dissenting minority for the remaining 19%. While the Seventh Circuit held that the cash given the minority precluded a "B" reorganization, the question is a debatable one and there is no assurance that other courts would follow that decision.

Brief for Government at 21, n.7 (cited in *Reeves, supra*, 737, n.13).

32. 71 T.C. 734.

33. *Mills* was decided under the 1954 Code, and the *Turnbow, Lutkins* and *Howard* decisions postdated the 1954 amendments, although they applied the 1939 Code. The Ninth Circuit in *Turnbow* viewed the change in (C) reorganizations as implying a congressional intent not to permit cash in (B) reorganizations—a view not shared by this Court. See text accompanying note 43, *infra*.

34. *Turnbow, supra*, 368 U.S. at 344 n.8, 82 S.Ct. at 357 n.8 This view was echoed by the Tax Court recently in *Reeves*, 71 T.C. 732.

## A. *Prior Views of the Statutory Scheme*

 What is abundantly clear from the legislative history of Sections 354(a)(1) and 368(a)(1)(B) and their predecessor provisions is (1) that the purpose of including stock and asset acquisitions among the reorganization provisions was to permit changes in corporate structure that are primarily changes in form similar to statutory mergers and consolidations;[35] and (2) that the "solely" requirement was added to the definitions of reorganizations in 1934 to eliminate the tax avoidance made possible when transactions that were in substance sales were restructured to take the form of reorganizations.[36] Since 1934, amendments to the reorganization provisions, as well as administrative and judicial interpretations of these sections, have focused in large measure on determining how strictly to apply the continuity of interest principle embodied in the "solely" requirement.[37] With respect at least to an asset acquisition, *Southwest Consolidated*, of course, held that a taxpayer did not retain a substantially unchanged interest in the enterprise if he received any cash at all, and therefore the Supreme Court interpreted "solely" to leave "no leeway" for the receipt of any consideration other than voting stock. *Southwest Consolidated, supra*, 315 U.S. at 198, 62 S.Ct. 546.

When the Seventh Circuit in *Howard* considered whether the *Southwest Consolidated* view of "solely" should be equally applicable to stock acquisitions, it found that the legislative history of the reorganization provisions conclusively determined that no distinction was to be made between the two types of reorganizations. The Ninth Circuit in *Turnbow* also found it "clear from this history that, with specific abuses in mind, Congress sought to eliminate them by requiring that, for an acquisition to qualify for the tax advantages of a reorganization, it must be in exchange solely for voting stock." 286 F.2d at 673. The Tax Court opinion in *Mills* likewise viewed the legislative history as mandating comparable treatment for stock and asset acquisitions.

The "legislative history" upon which the three courts relied was the 1934 report of the Senate Finance Committee cited above, which noted "that the proposed amendment requires that . . . the acquisition, whether of stock or of substantially all the properties, must be in exchange solely for the voting stock of the acquiring corpora-

---

**35.** *See* S.Rep. No. 558, 73d Cong., 2d Sess. 16–17 (1934).

**36.** *See* H.Rep. No. 704, 73d Cong., 2d Sess. 12–14 (1934).

**37.** The continuity of interest doctrine was a judicially developed principle aimed at preventing the same abuses that the 1934 amendment confronted: the disguising of sales as tax-free corporate reorganizations. The Supreme Court recognized that the aspect of a transaction that justified tax-free treatment was the lack of change in the quality of ownership interests held by the stockholders in the amalgamating companies. In construing section 112(i) of the Revenue Act of 1928, which included as a merger or consolidation "the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation . . .," the Court recognized that the interest the taxpayer acquired in the purchasing corporation "must be definite and material; it must represent a substantial part of the value of the thing transferred. This much is necessary in order that the result accomplished may genu-

inely partake of the nature of merger or consolidation." *Helvering v. Minnesota Tea Company*, 296 U.S. 378, 385, 56 S.Ct. 269, 272, 80 L.Ed. 284 (1935). *See also LeTulle v. Scofield*, 308 U.S. 415, 60 S.Ct. 313, 84 L.Ed. 355 (1940); *Pinellas Ice Co. v. Commissioner*, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428 (1933). Thus, the early judicial formulations of the continuity of interest principle required the transfer of a substantial interest in the acquiring corporation and did not absolutely bar the presence of cash in the transaction.

That Congress sought to import this principle when the "solely" requirement was enacted is demonstrated by the Report of the House Ways and Means Committee prior to the 1934 statutory changes. H.Rep. No. 704, 73d Cong., 2d Sess. 14 (1934). See Vernava, "The *Howard* and *Turnbow* Cases and the 'Solely' Requirement of B Reorganizations," 20 Tax L.Rev. 387, 394 & n.37 (1965) (hereinafter "Vernava"). One commentator has referred to this legislative effort as "a classic congressional overreaction." Dailey, "The Voting Stock Requirement of B and C Reorganizations," 26 Tax L.Rev. 725, 731 (1971).

tion."[38] This language, however, is in reality of little assistance, because it is impossible to determine whether "the acquisition" refers to all stock acquired in the transaction sought to be qualified as a reorganization, or to the eighty percent block of voting stock necessary to obtain control. As noted by the *Howard* court,[39] the Treasury Regulations perpetuated this uncertainty by providing that:

> In order to qualify as a "reorganization" under section 112(g)(1)(B), the acquisition by the acquiring corporation of the *required amount* of the stock of the other corporation must be in exchange solely for all or a part of the voting stock of the acquiring corporation. If for example Corporation X exchanges nonvoting preferred stock or bonds in addition to all or a part of its voting stock in the acquisition of the *required amount* of stock in Corporation Y, the transaction is not a "reorganization" under section 112(g)(1)(B). Reg. 111, § 29.112(g)–2 (emphasis supplied).

The use of the words "required amount" clearly invited the argument made by the taxpayer in *Howard*, as well as by the present plaintiff, that the "solely" requirement applied only to the acquisition of the eighty percent block of stock necessary to transfer control within the meaning of the statute.

Although *Southwest Consolidated* resolved this ambiguity with respect to asset acquisitions, those cases that grappled with the rationale for applying *Southwest Consolidated* to stock acquisitions found reason to do so in an ambiguous legislative history that, at best, compels the conclusion that Congress never squarely considered the

question whether the presence of boot would vitiate a (B) reorganization. The passage of the 1939 Revenue Act, which separated the treatment of stock and asset acquisitions into two distinct provisions but made no change in the "solely" requirement, cannot be read to imply a legislative approval of any particular interpretation of the term "solely." It seems reasonable to believe that this statutory change bears little significance for the question at hand. None of the cases discussing the position urged by the plaintiff was decided prior to 1939, and as a consequence there is no reason to conclude that Congress was aware of the latent ambiguity. It is more likely that the separation of the two types of acquisitions was required because the 1939 Revenue Act added, in the case of asset acquisitions only, a provision permitting the acquiring corporation to assume the liabilities of the acquired corporation.[40] Furthermore, the pressures upon the acquiring corporation to buy out the interests of dissenting shareholders is greater in a stock acquisition than in an asset acquisition, where dissenters may have appraisal rights against the acquired corporation.[41] Although this distinction might have led Congress, had it considered the question, to permit boot in a (B) reorganization, even after *Southwest Consolidated* absolutely precluded it in (C) reorganizations, none of the cases that analogized stock and asset acquisitions explored this line of reasoning before concluding that *Southwest Consolidated* governed both types of transactions.

The advent of the 1954 Code compounded the uncertainty surrounding the question here presented and significantly changed some aspects of the reorganization provisions. Two changes embodied in that Code

**38.** S.Rep. No. 558, 73d Cong., 2d Sess. 16 (1934). See notes 16–18, *supra*, and accompanying text.

**39.** 238 F.2d at 945.

**40.** *See* H.Rep. No. 855, 76th Cong., 1st Sess. 5, 19 (1934); S.Rep. No. 648, 76th Cong., 1st Sess. 3 (1939).

**41.** See Vernava, *supra* note 37, at 397–99 & nn.51–54; B. Fox and E. Fox, *Corporate Acquisitions and Mergers*, §§ 23.04 & 26.01–.04

(1977); W. M. Fletcher, *Cyclopedia of the Law of Private Corporations*, § 5906.2 (1970). See also text accompanying note 59, *infra*. The state banking law provision which gave appraisal rights to shareholders in the stock acquisition context and which prompted Revenue Ruling 68–285, 1968–1 C.B. 147 (permitting redemption of dissenters' shares for cash by the acquired corporation) is believed to be *sui generis*.

are of particular relevance. First, Congress legislatively altered the *Southwest Consolidated* result by providing that an asset acquisition can be treated as a tax-free reorganization even though as much as twenty percent of the assets involved are acquired for cash.[42] The Ninth Circuit opinion in *Turnbow* concluded—as the Commissioner here urges this Court to conclude—that because Congress altered the statutes to permit boot in (C) reorganizations, it must be inferred that it intended no such liberalization of the statute with regard to (B) reorganizations.[43] Although it is reasonable to assume that Congress knew of the result in *Southwest Consolidated* when the 1954 Code was enacted, and therefore intended to alter the rules governing asset acquisitions, no such assumption is warranted with respect to stock acquisitions. Neither the Tax Court nor the Seventh Circuit had decided *Howard* prior to the enactment of the 1954 Code, and the cursory treatment given

the issue in *Pulfer* and in *Air Reduction* suggests that Congress might have been no more aware of the stock acquisition question in 1954 than it apparently was in 1939.[44]

The second relevant change wrought by the 1954 Code involves its provision in Section 368(a)(1)(B) for what has come to be known as "creeping acquisitions." The pre-1954 requirement that the qualifying transaction involve the transfer of an eighty percent control-block of stock was abandoned in 1954 in favor of the following definition of a reorganization involving a stock acquisition:

"[R]eorganization" means—

(B) The acquisition by one corporation, in exchange solely for all or part of its voting stock . . . ., of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corpora-

---

42. This liberalization of the treatment of boot in a (C) reorganization is embodied in § 368(a)(2)(B), which provides as follows:

(B) Additional consideration in certain paragraph (1)(C) cases.—If—

(i) one corporation acquires substantially all of the properties of another corporation,

(ii) the acquisition would qualify under paragraph (1)(C) but for the fact that the acquiring corporation exchanges money or other property in addition to voting stock, and

(iii) the acquiring corporation acquires, solely for voting stock described in paragraph (1)(C), property of the other corporation having a fair market value which is at least 80 percent of the fair market value of all of the property of the other corporation,

then such acquisition shall (subject to subparagraph (A) of this paragraph) be treated as qualifying under paragraph (1)(C). Solely for the purpose of determining whether clause (iii) of the preceding sentence applies, the amount of any liability assumed by the acquiring corporation, and the amount of any liability to which any property acquired by the acquiring corporation is subject, shall be treated as money paid for the property.

43. 286 F.2d at 674.

44. Congress also amended § 368(a)(1)(B) in 1964 to permit the stock used in a (B) reorganization to be that of the parent of an acquiring corporation. Nothing in the legislative history of this amendment reveals a congressional intent to confirm a rule precluding boot in a

stock acquisition. Rather, the Senate Report preceding the 1964 Act suggests a congressional commitment to treating (B) and (C) reorganizations identically:

Thus, the 1954 code permits tax-free reorganizations in the case of the exchange of the parent's stock for the assets of a corporation acquired by the subsidiary. However, a similar result is denied where the subsidiary acquires the stock of the other corporation in exchange for the stock of its parent corporation. Since Congress has considered the "continuity of interest" rule satisfied in the case of asset acquisitions, there seems to be no reason for not applying the same rule to stock acquisitions, since there is little in substance to distinguish an asset acquisition from a stock acquisition.

As a result, your committee has concluded that it is desirable to treat these two types of acquisitions in the same manner. For that reason, it has provided tax-free status for the stock-for-stock reorganization in the same manner that present law provides a tax-free status for stock-for-assets reorganizations. S.Rep. No. 830, 88th Cong., 2d Sess. 83 (1964); U.S.Code Cong. & Admin.News 1964, pp. 1313, 1755. If both types of reorganizations were to receive identical treatment, it seems more reasonable to infer that at the time of the 1964 amendment Congress believed 20% boot was already permissible in (B) reorganizations (as was then true of (C) reorganizations) than to conclude that Congress intended to retain and approve a "no leeway" rule.

tion (whether or not such acquiring corporation had control immediately before the acquisition); . . .[45]

The definition of control in Section 368(c) still requires that the acquiring company possess "at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation."

A principal effect of the "creeping control amendments" is the granting of reorganization status to transactions involving the acquisition of relatively small quantities of stock by an acquiring corporation already holding large blocks of stock in the acquired corporation that were previously purchased for cash.[46] Although the conclusion is inescapable that the "creeping control amendments" signal a departure from Congressional commitment to some of the principles that might justify a "strict" interpretation of the "solely" requirement in Section 368(a)(1)(B),[47] none of the opinions analyzing the legislative history of the reorganization provisions (all of which were decided subsequent to 1954) makes any reference to the significance of these amendments.

As the foregoing discussion demonstrates, this Court is not convinced that the efforts made by other courts to base a strict interpretation of the "solely" requirement on legislative history successfully rebut the Supreme Court's view in *Turnbow* that the meager expressions of congressional intent with respect to the presence of boot in (B) reorganizations are "inconclusive." On the contrary, I believe that the rule here urged by plaintiff is more consistent with the overall statutory scheme presently embodied in the reorganization provisions.

### B. *Reexamination of Legislative Policy*

In seeking to persuade this Court that the "solely" requirement admits of no boot in a (B) reorganization, the Commissioner has pointed primarily to the line of cases deciding the issue in his favor and their limited attempts to analyze the history of the reorganization provisions and argues that the holdings of these cases constitute not only settled law but also the accepted rule upon which the tax bar and the business community rely in structuring business transactions. Because it is concluded—along with the recent Tax Court opinion in *Reeves* —that the prior court decisions are not dispositive of this issue, this Court must squarely confront the Commissioner's argument that it would be ill-advised to disturb settled business practice.

▮ There can be no serious question that the rule precluding boot in stock acquisitions is generally followed when parties plan a transaction intending it to qualify as a tax-free (B) reorganization. Indeed, as Judge Wilbur noted in his dissent from the *Reeves* opinion, there are undoubtedly many transactions still "open" for tax purposes that were structured in express reliance upon the "strict" interpretation of the "solely" requirement.[48] Although the Supreme Court's language in *Turnbow*, as well as this Court's evaluation of the strength of prior precedent, may suggest that the rule urged by the Commissioner is less than well settled,[49] the Court nonetheless recognizes that the realities of business transactions often induce compliance with a Treasury Regulation or a rule of law that the parties view as unwise and subject to challenge. The luxury of vindicating a legal position through protracted litigation is

---

**45.** Section 368(a)(1)(B).

**46.** S.Rep. No. 1622, 83d Cong., 2d Sess. 273 (1954); U.S.Code Cong. & Admin.News 1954, p. 4269.

**47.** See notes 61–62, *infra*, and accompanying text.

**48.** *Reeves, supra*, 744, (Wilbur, J., dissenting).

**49.** The business community has also heard warnings of the *Howard* rule's fragility from several other quarters. See text accompanying notes 51–53, *infra*. See also, Vernava, *supra* note 37; Kanter, *supra* note 30; Toll, "Transfers of Boot in Stock-for-Stock Acquisitions," 15 UCLA L.Rev. 1347 (1968) (hereinafter "Toll"); Merritt, "Tax-Free Corporate Acquisitions—The Law and the Proposed Regulations," 53 Mich.L.Rev. 911 (1955) (hereinafter "Merritt").

simply unavailable to a company that must promptly consummate a merger or acquisition in order to reap the transaction's full financial benefits. Any additional tax advantage that could accrue from compelling the Internal Revenue Service to change its view of the transaction will often be outweighed by the danger that the business deal will have long since vanished when a final judicial determination of the tax question is rendered. The exigencies of the business world preclude challenge to the rulings and regulations of the Internal Revenue Service prior to consummation of a transaction, and thus afford them a somewhat artificial finality. As a consequence, the prudent tax practitioner can only counsel his client to proceed on the basis of the law as interpreted by the Internal Revenue Service—either in its regulations or in a private ruling—irrespective of the soundness of the Commissioner's position.[50] Although this problem may be predictable and unavoidable, it should not preclude effective judicial review of action taken by the Internal Revenue Service, nor should it prevent the Court from reexamining the precedential value of prior case law. To the

extent parties rely upon interpretations of the tax laws that are vulnerable to future challenges, they must be held to have assumed the risk that their interests will be affected by subsequent changes in the law. Any greater deference to their expectations of finality would approach an abdication of the Court's proper function.

The rule urged by plaintiff and recently adopted by the Tax Court is eminently reasonable: it involves no strained interpretation of the "solely" requirement; it leads to no anomalous results; and it violates no significant policy embodied in the Tax Code. The Commissioner, indeed, has advanced no policy or legislative goal that is either frustrated or promoted if "solely" is given the interpretation urged by plaintiff rather than that advanced by the government.[51] Both courts considering the *Howard* case recognized the logical persuasion of the position now taken by plaintiffs: the Seventh Circuit conceded the ambiguity of the Treasury Regulation then in effect,[52] and the Tax Court noted that "there is force to petitioners' argument that the practical objectives of the statute might well be satisfied if we were to adopt the

---

**50.** The case at bar is a prime example of this phenomenon. ITT and Hartford attempted to structure their amalgamation to fall within the definition of a (B) reorganization, and to accomplish that end ITT sought divestiture of its cash acquired shares and a ruling from the Service that they would not thereafter taint the exchange offer. Thus, the issue here presented and the argument raised by plaintiff are advanced only because the Service revoked its ruling after the transaction was *a fait accompli*.

It is noted that the delay ordinarily inherent in obtaining a letter ruling may render impractical even this method of assuring tax-free treatment by the Service. Currently, rulings are generally not issued until about 10 weeks after submission of the request, and the delay may be more than three months if more than one branch of the Service is involved. 104–5th *Tax Management, IRS National Office Procedures—Rulings, Closing Agreements*, A–21 (1977). The problem has apparently existed for a number of years, for in 1968 the anticipated delay was four to six months. Smith, "Tax Rulings—Their Use and Abuse," *Proceedings of the Twentieth Tax Institute of the University of Southern California School of Law*, 663, 672 (1968).

**51.** As the Tax Court noted in *Reeves, supra*, slip op. at 29–30, the Commissioner's own rulings have often evidenced a concern that reorganizations may be unduly restricted by a literal enforcement of the "solely" requirement. While adhering to the interpretation of "solely" presently urged, the Commissioner has nonetheless carved out numerous limited exceptions to the rule absolutely barring cash from (B) reorganizations. See Rev. Rul. 72–354, 1972–2 C.B. 276 ("purging" of transaction by unconditional sale of stock acquired for cash to an unrelated third party prior to exchange offer); Rev. Rul. 72–522, 1972–2 C.B. 215 (purchase of stock for cash directly from target corporation); Rev. Rul. 68–285, 1968–1 C.B. 147 (redemption of dissenters' shares for cash paid from escrow account established by acquired corporation); Rev. Rul. 68–562, 1968–2 C.B. 157 (purchase of 50% of target corporation's stock for cash by controlling shareholder of acquiring corporation); Rev. Rul. 73–54, 1973–1 C.B. 187 (payment of acquired corporation's reorganization expenses by the acquiring corporation); Rev. Rul. 56–184, 1956–1 C.B. 190 (dividend of earnings from certain date to closing date of reorganization).

**52.** 238 F.2d at 945.

construction urged," [53] but nevertheless considered itself bound by prior precedent.

Being unable to adhere to the view of the *Howard* Courts, this Court concludes that the rule plaintiff urges is the more reasonable one in the context of the legislative approach to reorganizations. Clearly, the principal policy underlying the statutory scheme—that of facilitating corporate reorganizations—is furthered if the "solely" requirement is interpreted to permit the acquiring corporation some use of cash in effecting the acquisition. Furthermore, the present structure of the reorganization provisions, particularly as developed through the 1939 and 1954 Amendments to the Code, suggests a congressional concern for providing corporations with practical means of accomplishing tax-free reorganizations without being left at the mercy of shareholders representing a small percentage of the ownership interest in the acquired corporation. It will be remembered that the judicial expression of the continuity of interest principle was not an absolute one, [54] but that the Supreme Court in *Southwest Consolidated* viewed its legislative embodiment as articulating a much stricter standard. [55] After the *Southwest Consolidated* decision, however, Congress amended the reorganization provisions to permit the presence of twenty percent cash in a (C) reorganization. [56]

If Congress was content to permit up to twenty percent boot in a (C) reorganization, it must be assumed *a fortiori* that an equivalent amount of boot was permissible in a (B) reorganization, absent a clear rule to the contrary of which Congress must have been aware. [57] The stated congressional policy of obviating difficulties in completing asset acquisitions "where certain shareholders of the transferor corporation may wish to receive property instead of stock in the continuing corporation" [58] applies equally to stock acquisitions. The pressures from dissenting shareholders may in fact be greater in a stock acquisition than in an asset acquisition, because in some states the rights of the dissenters to an asset acquisition may be expeditiously determined and satisfied through an appraisal mechanism, while no such system is generally available to relieve the pressures facing a corporation that acquires control of another business through a stock-for-stock reorganization. I view this distinction as a basis, at least, for questioning whether Congress would have applied the *Southwest Consolidated* holding to stock acquisitions prior to 1954, but in light of Congress' decision in 1954 to alter the rule of that case and to permit up to twenty percent boot in asset acquisitions, the distinction also invites the logical inference that both types or reorganizations should now be treated identically. [59]

The conclusion that Congress intended to allow the payment of cash for up to twenty percent of the stock in an acquired corporation within the definition of a (B) reorganization is also supported by the 1954 addition of the "creeping control amendments." [60] These provisions operate to permit an acquiring corporation to purchase any amount of stock in another corporation and subsequently to qualify a stock-for-stock exchange transaction as a (B) reorganization, so long as "control" is gained or retained. The anomaly of enforcing the strict interpretation of the "solely" requirement here urged by the Commissioner while permitting acquisitions under the "creeping control amendments" has been described by one commentator as follows:

> Since the regulations permit an acquisition for voting stock of 20 percent or less

---

**53.** 24 T.C. at 804.

**54.** *See* note 37 *supra.*

**55.** 315 U.S. at 198, 62 S.Ct. 546.

**56.** See note 42, *supra,* and accompanying text.

**57.** See notes 41–44, *supra,* and accompanying text.

**58.** S.Rep. No. 1622, 83d Cong., 2d Sess. 273 (1954); U.S.Code Cong. & Admin.News 1954, p. 4025.

**59.** See note 41, *supra,* and accompanying text. Subsequent amendments likewise support this view. See note 44, *supra.*

**60.** *See* note 45, *supra* and accompanying text.

of the stock of an acquired corporation to qualify as a (B) reorganization where 80 percent of the stock had previously been acquired for cash, it is difficult to understand the rationale which would prevent a contemporaneous acquisition for cash and stock from qualifying as long as the cash did not exceed 20 percent of the consideration.[61]

The quoted passage emphasizes a concern of this Court: that the Internal Revenue Code be capable of treatment as a "well-ordered universe." [62] Some margin for boot is permissible under Section 368(a)(1) in each type of reorganization that resembles a merger or acquisition. In an (A) reorganization, the statutory merger or consolidation is restricted only by the continuity of interest doctrine; [63] a (C) reorganization may survive the acquisition for cash of up to twenty percent of all the assets of the acquired corporation.[64] When Congress made provision in 1971 for the nonrecognition of gain or loss in a "[s]tatutory merger using voting stock of [a] corporation controlling [the] merged corporation," [65] the presence of twenty percent nonstock consideration was specifically permitted.[66] Because it is concluded that Congress' failure

to amend the (B) reorganization definition expressly to permit boot in that type of reorganization cannot be read to imply the legislative approval of a clear and well-reasoned judicial rule to the contrary,[67] this Court cannot endorse an interpretation of the "solely" requirement in (B) reorganizations that would so drastically depart from the statute's pattern of permitting some boot in reorganizations.

## CONCLUSION

■ This Court believes that the question presently under consideration has in all likelihood escaped Congress' direct attention. The attention given the question in opinions addressing it prior to the Tax Court's recent decision in *Reeves v. Commissioner* does not convince this Court that the widely accepted rule precluding the transfer of any cash consideration in a (B) reorganization is warranted by the express language of the Internal Revenue Code or by its relatively sparse legislative history. The precedential value of those earlier cases is undermined by their failure to recognize that Congress had never manifested an intent to apply the *Southwest Consolidated* rule to stock acquisitions, and that consider-

---

**61.** Toll, *supra* note 49, at 1365, citing Merritt, *supra* note 49, at 933.

In urging the adoption of an interpretation of the solely requirement in (B) reorganizations like that proposed by the plaintiff herein, Mr. Merritt notes:

If the Treasury should ultimately accept this interpretation, it may seek to put an overall limitation on "creeping control" situations by providing that if in the transaction which the taxpayer wishes to qualify as a "B" reorganization there is boot given in exchange for a part of the stock of Corporation Y, then there will be a "B" reorganization only if the stock constituting "control" was *in fact* acquired solely for voting stock in Corporation X . . . . Caution would indicate the avoidance of a single transaction wherein both voting stock and boot is given by Corporation X, and where the stock of Corporation Y acquired solely for voting stock of Corporation X is not sufficient in itself to bring about a meeting of the "control" definition.

Merritt, *supra* note 49, at 929–30. The parties to the Hartford-ITT merger were careful to avoid such a transaction, and it is emphasized that the question suggested by the quoted pas-

sage is not presently before this Court. *See* note 5, *supra*.

**62.** Merritt, *supra* note 49, at 933.

**63.** *See Helvering v. Minnesota Tea Co.*, 296 U.S. 378, 56 S.Ct. 269, 80 L.Ed. 284 (1935).

**64.** *See* § 368(a)(2)(B), quoted in full at note 42, *supra*. Because any assumption of the acquired corporation's liabilities by the acquiring corporation in connection with a (C) reorganization is treated as part of the 20% permissible boot, this leeway may in many cases prove illusory, but the statute can hardly be viewed as mandating the absolute preclusion of cash here urged by the Commissioner in (B) reorganizations. *See* Vernava, *supra* note 37, at 407–08.

**65.** Section 368(a)(2)(E).

**66.** *See* S.Rep. No. 91–1533, 91st Cong., 2d Sess. 2 (1970); H.Rep. No. 91–1778, 91st Cong., 2d Sess. 3 (1970); U.S.Code Cong. & Admin.News 1970, p. 6123.

**67.** See notes 41–44, *supra*, and accompanying text.

ation of the policies underlying the reorganization provisions might well have dictated an opposite conclusion. The legislative decision to overrule the *Southwest Consolidated* result, when viewed in light of the other changes made in 1954 and subsequently, suggests that the statutory scheme presently in effect should be interpreted to provide similar tax treatment to asset and stock acquisitions and to permit the limited use of boot in both types of transactions. In an effort to achieve statutory consistency and fidelity to the fundamental policies underlying the Code's reorganization provisions, I conclude that at least where eighty percent of the stock of an acquired corporation is exchanged in a single transaction for voting stock in the acquiring corporation, the payment within the same transaction of cash or other nonstock consideration for additional shares in the acquired corporation will not preclude the transaction's qualification as a tax-free reorganization under Section 368(a)(1)(B) of the Internal Revenue Code.

Plaintiff's motion for summary judgment will, therefore, be granted.