Eldon S. CHAPMAN et al.,
Petitioners, Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent, Appellant.

No. 79–1336.

United States Court of Appeals,
First Circuit.

Argued Nov. 7, 1979.

Decided March 31, 1980.

Ernest J. Brown, Atty., Dept. of Justice, Washington, D.C., with whom M. Carr Ferguson, Asst. Atty. Gen., and Gilbert E. Andrews, Atty., Dept. of Justice, Washington, D.C., were on brief, for respondent, appellant.

John H. Schafer, Washington, D.C., with whom Newman T. Halvorson, Jr., Charles Lister, Covington & Burling, Washington, D.C., James S. Eustice, Stephen D. Gardner, Kronish, Lieb, Shainswit, Weiner & Hellman, Robert A. Kagan and Edwin A. Kilburn, New York City, were on brief, for petitioners, appellees.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

This appeal by the Internal Revenue Service from a decision of the Tax Court calls for the construction of certain corporate reorganization provisions of the Internal Revenue Code, 26 U.S.C. §§ 354(a)(1) and 368(a)(1).[1] We must decide whether the

---

1. Section 354(a)(1) provides:

"(a) General rule.—

(1) In general.—No gain or loss shall be recognized if stock or securities in a corpora-

tion a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such

requirement of Section 368(a)(1)(B) that the acquisition of stock in one corporation by another be solely in exchange for voting stock of the acquiring corporation is met where, in related transactions, the acquiring corporation first acquires 8 percent of the acquiree's stock for cash and then acquires more than 80 percent of the acquiree in an exchange of stock for voting stock. The Tax Court agreed with the taxpayers that the latter exchange constituted a valid tax-free reorganization. *Reeves v. Commissioner*, 71 T.C. 727 (1979).

*The Facts*

Appellees were among the more than 17,000 shareholders of the Hartford Fire Insurance Company who exchanged their Hartford stock for shares of the voting stock of International Telephone and Telegraph Corporation pursuant to a formal exchange offer from ITT dated May 26, 1970.[2] On their 1970 tax returns, appellees did not report any gain or loss from these exchanges. Subsequently, the Internal Revenue Service assessed deficiencies in the amounts of $15,452.93 (Chapman), $43,962.66 (Harry), $55,778.45 (Harwood), and $4,851.72 (Ladd). Appellees petitioned the Tax Court for redetermination of these deficiencies, and their cases were consolidated with those of twelve other former Hartford shareholders. The Tax Court, with five judges dissenting,[3] granted appellees' motion for summary judgment, and the Commissioner of Internal Revenue filed this appeal.

The events giving rise to this dispute began in 1968, when the management of ITT, a large multinational corporation, became interested in acquiring Hartford as part of a program of diversification. In October 1968, ITT executives approached Hartford about the possibility of merging the two corporations. This proposal was spurned by Hartford, which at the time was considering acquisitions of its own. In November 1968, ITT learned that approximately 1.3 million shares of Hartford, representing some 6 percent of Hartford's voting stock, were available for purchase from a mutual fund. After assuring Hartford's directors that ITT would not attempt to acquire Hartford against its will, ITT con-

corporation or in another corporation a party to the reorganization."

Section 368(a)(1) defines "reorganization":

"(a) Reorganization.—

(1) In general.—For purposes of parts I and II and this part, the term 'reorganization' means—

(A) a statutory merger or consolidation;

(B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation (whether or not such acquiring corporation had control immediately before the acquisition);

(C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of substantially all of the properties of another corporation, but in determining whether the exchange is solely for stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded;

(D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356;

(E) a recapitalization; or

(F) a mere change in identity, form, or place of organization, however effected."

2. Venue in these four cases lies in this court because appellees were residents of Massachusetts and Maine at the time they filed their petitions in the Tax Court. *See* 26 U.S.C. § 7482(b)(1).

3. Judge Tannenwald wrote the opinion for a plurality of the Tax Court, two judges concurred only in the result, and five dissented. Four judges did not participate and one vacancy existed at the time. We are informed by counsel for the Commissioner that this necessarily indicates the majority, including concurrences, consisted of six members of the court.

summated the $63.7 million purchase from the mutual fund with Hartford's blessing. From November 13, 1968 to January 10, 1969, ITT also made a series of purchases on the open market totalling 458,000 shares which it acquired for approximately $24.4 million. A further purchase of 400 shares from an ITT subsidiary in March 1969 brought ITT's holdings to about 8 percent of Hartford's outstanding stock, all of which had been bought for cash.

In the midst of this flurry of stock-buying, ITT submitted a written proposal to the Hartford Board of Directors for the merger of Hartford into an ITT subsidiary, based on an exchange of Hartford stock for ITT's $2 cumulative convertible voting preferred stock. Received by Hartford in December of 1968, the proposal was rejected in February of 1969. A counterproposal by Hartford's directors led to further negotiations, and on April 9, 1969 a provisional plan and agreement of merger was executed by the two corporations. While not unlike the proposal Hartford had earlier rejected, this plan was somewhat more favorable to Hartford's stockholders.[4] The merger agreement was conditioned upon approval, as required under state law, by the shareholders of the two corporations and by the Connecticut Insurance Commissioner. In addition, Hartford had an unqualified right to terminate the agreement if it believed there was any likelihood that antitrust litigation would be initiated. Although such litigation in fact materialized, Hartford's board of directors pushed ahead with the merger, and in October 1969 a Justice Department motion to enjoin the merger was denied by the United States District Court for the District of Connecticut.

Meanwhile, on April 15, 1969, attorneys for the parties sought a ruling from the IRS that the proposed transaction would constitute a reorganization under Section 368(a)(1)(B) of the Internal Revenue Code of 1954, so that, among other things, gain realized on the exchange by Hartford shareholders would not be recognized, see 26 U.S.C. § 354(a)(1). By private letter ruling, the Service notified the parties on October 13, 1969 that the proposed merger would constitute a nontaxable reorganization, provided ITT unconditionally sold its 8 percent interest in Hartford to a third party before Hartford's shareholders voted to approve or disapprove the proposal. On October 21, the Service ruled that a proposed sale of the stock to Mediobanca, an Italian bank, would satisfy this condition, and such a sale was made on November 9.

On November 10, 1969, the shareholders of Hartford approved the merger, which had already won the support of ITT's shareholders in June. On December 13, 1969, however, the merger plan ground to a halt, as the Connecticut Insurance Commissioner refused to endorse the arrangement. ITT then proposed to proceed with a voluntary exchange offer to the shareholders of Hartford on essentially the same terms they would have obtained under the merger plan.[5] After public hearings and the imposition of certain requirements on the post-acquisition operation of Hartford, the insurance commissioner approved the exchange offer on May 23, 1970, and three days later ITT submitted the exchange offer to all Hartford shareholders. More than 95 percent of Hartford's outstanding stock was exchanged for shares of ITT's $2.25 cumulative convertible voting preferred stock. The Italian bank to which ITT had conveyed its original 8 percent interest was

4. In particular, the annual dividend on the preferred shares was to be $2.25 rather than $2.00, and the conversion ratio was set at a rate more favorable to Hartford shareholders.

5. Apparently, the insurance commissioner was concerned, among other things, about the rights of dissenting shareholders, who could have been forced to exchange their Hartford shares under the merger plan. Minority shareholders under the second proposal were to

have the right to withhold some or all of their stock from the exchange if they so chose. See *Pierson v. United States*, 472 F.Supp. 957, 959–60 (D.Del.1979). The second exchange offer provided that ITT would definitely accept the exchange if more than 95 percent of Hartford's shares were tendered, and would have the option to accept if 80 percent or more were tendered.

among those tendering shares, as were the taxpayers in this case.

In March 1974, the Internal Revenue Service retroactively revoked its ruling approving the sale of Hartford stock to Mediobanca, on the ground that the request on which the ruling was based had misrepresented the nature of the proposed sale. Concluding that the entire transaction no longer constituted a nontaxable reorganization, the Service assessed tax deficiencies against a number of former Hartford shareholders who had accepted the exchange offer. Appellees, along with other taxpayers, contested this action in the Tax Court, where the case was decided on appellees' motion for summary judgment. For purposes of this motion, the taxpayers conceded that questions of the merits of the revocation of the IRS rulings were not to be considered; the facts were to be viewed as though ITT had not sold the shares previously acquired for cash to Mediobanca. The taxpayers also conceded, solely for purposes of their motion for summary judgment, that the initial cash purchases of Hartford stock had been made for the purpose of furthering ITT's efforts to acquire Hartford.

*The Issue*

Taxpayers advanced two arguments in support of their motion for summary judgment. Their first argument related to the severability of the cash purchases from the 1970 exchange offer. Because 14 months had elapsed between the last of the cash purchases and the effective date of the exchange offer, and because the cash purchases were not part of the formal plan of reorganization entered into by ITT and Hartford, the taxpayers argued that the 1970 exchange offer should be examined in isolation to determine whether it satisfied the terms of Section 368(a)(1)(B) of the 1954 Code. The Service countered that the two sets of transactions—the cash purchases and the exchange offer—were linked by a common acquisitive purpose, and that they should be considered together for the purpose of determining whether the arrangement met the statutory requirement that the stock of the acquired corporation be exchanged "solely for . . . voting stock" of the acquiring corporation. The Tax Court did not reach this argument; in granting summary judgment it relied entirely on the taxpayers' second argument.

For purposes of the second argument, the taxpayers conceded *arguendo* that the 1968 and 1969 cash purchases should be considered "parts of the 1970 exchange offer reorganization." Even so, they insisted upon a right to judgment on the basis that the 1970 exchange of stock for stock satisfied the statutory requirements for a reorganization without regard to the presence of related cash purchases. The Tax Court agreed with the taxpayers, holding that the 1970 exchange in which ITT acquired more than 80 percent of Hartford's single class of stock for ITT voting stock satisfied the requirements of Section 368(a)(1)(B), so that no gain or loss need be recognized on the exchange under Section 354(a)(1). The sole issue on appeal is whether the Tax Court was correct in so holding.[6]

I.

We turn first to the statutory scheme under which this case arose.[7] The basic

---

**6.** Under 26 U.S.C. § 7482(a), the court of appeals has jurisdiction to review decisions of the Tax Court "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." *See* 9 Moore's Federal Practice ¶ 213.03[3] at 3022–23. As this case reaches us on a grant of summary judgment, we review this issue as we would any pure issue of law, with due regard for the Tax Court's expertness in its field.

**7.** The corporate reorganization provisions of the tax code seem at first glance arcane, technical, and all-but-impenetrable. In the words of Justice Whittaker, considering a statutory scheme pre-dating the one before us:

"Because of the arbitrary and technical character, and of the somewhat 'hodgepodge' form, of the statutes involved, the interpretation problem presented is highly complicated; and although both parties rely upon the 'plain words' of these statutes, they arrive at diametrically opposed conclusions. That plausible arguments can be and have been made in support of each conclusion must be admitted; and, as might be expected, they have hardly lightened our inescapable burden of decision."

rule governing exchanges was imported from Section 1002 of the 1954 Code, 26 U.S.C. § 1002. Section 1002 stated that, except as otherwise provided, gain or loss on the exchange of property should be recognized and taken into account in computing a taxpayer's taxable income.[8] One exception to that rule appears in Section 354(a)(1), which provides that gain or loss shall not be recognized if stock or securities in a corporation are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in another corporation which is a party to the reorganization.[9] This exception does not grant a complete tax exemption for reorganizations, but rather defers the recognition of gain or loss until some later event such as a sale of stock acquired in the exchange.[10] Section 354(a)(1) does not apply to an exchange unless the exchange falls within one of the six categories of "reorganization" defined in Section 368(a)(1).[11] The category relevant to the transactions involved in this case is defined in Section 368(a)(1)(B):

> "[T]he term 'reorganization' means—
>
> > (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock . . . of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation (whether or not such acquiring corporation had control immediately before the acquisition)." [12]

The concept of "control" is defined in Section 368(c) as "the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation." [13] Sub-

---

*Turnbow v. Commissioner*, 368 U.S. 337, 339, 82 S.Ct. 353, 355, 7 L.Ed.2d 326 (1961). *See also Daniel* 5:7 (King James).

**8.** The substance of Section 1002 was transferred to Section 1001(c) by an amendment passed in 1976. Pub.L.No. 94–455, Title XIX, § 1901(a)(121), 90 Stat. 1784.

**9.** See footnote 1 for text of Section 354(a)(1).

**10.** *See* 3 J. Mertens, The Law of Federal Income Taxation § 20.85 n.84 (1972). Under 26 U.S.C. § 358, the taxpayer's basis in his newly acquired stock is, with certain qualifications, the same as the basis of the old stock he gave up in the exchange. *See* 3A J. Mertens, *supra*, §§ 20.96, 20.100.

**11.** See footnote 1 for text of Section 368(a)(1). In the tax practice, these six categories are referred to by their alphabetic designations in the 1954 Code: hence, an (A) reorganization is a statutory merger or consolidation, a (B) reorganization is a stock-for-stock acquisition, a (C) reorganization is a stock-for-assets acquisition, a (D) reorganization is a corporate transfer of assets to a controlled corporation, an (E) reorganization is a recapitalization, and an (F) reorganization is a mere change in identity, form, or place of organization.

From the literal language of Section 354(a)(1), it might appear that an exchange is tax-free only where no consideration other than stock or securities is involved. However, it is settled that the presence of "boot"—in the form of money or other property in the exchange—does not lead to full recognition of gain. Section 356(a)(1) provides:

"(a) Gain on exchanges.—
(1) Recognition of gain.—If—
(A) section 354 or 355 would apply to an exchange but for the fact that
(B) the property received in the exchange consists not only of property permitted by section 354 or 355 to be received without the recognition of gain but also of other property or money,
then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property."

Thus, where a transaction constitutes a valid reorganization within one of the six categories of Section 368(a)(1), and where it would satisfy Section 354 but for the presence of "boot," gain is recognized in the exchange only to the extent of the value of the "boot." *See Turnbow v. Commissioner*, 368 U.S. 337, 82 S.Ct. 353, 7 L.Ed.2d 326 (1961). The critical question in a case of this nature is not whether "boot" is a part of the plan of reorganization, but whether the presence of "boot" is consistent with a valid reorganization under some provision of Section 368(a)(1). *See id.* at 344, 82 S.Ct. at 357.

**12.** Material not relevant to this case, regarding parent corporations, has been omitted from the quotation.

**13.** The parties do not contest the fact that ITT had control of Hartford, as defined by Section 368(c), immediately after the 1970 exchange, whether or not the cash purchases were included in ITT's holdings.

section (B) thus establishes two basic requirements for a valid, tax-free stock-for-stock reorganization. First, "the acquisition" of another's stock must be "solely for . . . voting stock." Second, the acquiring corporation must have control over the other corporation immediately after the acquisition.

■ The single issue raised on this appeal is whether "the acquisition" in this case complied with the requirement that it be "solely for . . . voting stock." It is well settled that the "solely" requirement is mandatory; if any part of "the acquisition" includes a form of consideration other than voting stock, the transaction will not qualify as a (B) reorganization. *See Helvering v. Southwest Consolidated Corp.*, 315 U.S. 194, 198, 62 S.Ct. 546, 550, 86 L.Ed. 789 (1942) (" 'Solely' leaves no leeway. Voting stock plus some other consideration does not meet the statutory requirement"). The precise issue before us is thus how broadly to read the term "acquisition." The Internal Revenue Service argues that "the acquisition . . . of stock of another corporation" must be understood to encompass the 1968–69 cash purchases as well as the 1970 exchange offer. If the IRS is correct, "the acquisition" here fails as a (B) reorganization. The taxpayers, on the other hand, would limit "the acquisition" to the part of a sequential transaction of this nature which meets the requirements of subsection (B). They argue that the 1970 exchange of stock for stock was itself an "acquisition" by ITT of stock in Hartford solely in exchange for ITT's voting stock, such that after the exchange took place ITT controlled Hartford. Taxpayers contend that the earlier cash purchases of 8 percent, even if conceded to be part of the same acquisitive plan, are essentially irrelevant to the tax-free reorganization otherwise effected.

The Tax Court accepted the taxpayers' reading of the statute, effectively overruling its own prior decision in *Howard v. Commissioner*, 24 T.C. 792 (1955), *rev'd on other grounds*, 238 F.2d 943 (7th Cir. 1956).[14] The plurality opinion stated its "narrow" holding as follows:

> "We hold that where, as is the case herein, 80 percent or more of the stock of a corporation is acquired in one transaction,[18] in exchange for which only voting stock is furnished as consideration, the 'solely for voting stock' requirement of section 368(a)(1)(B) is satisfied.
>
> [18] In determining what constitutes 'one transaction,' we include all the acquisitions from shareholders which were clearly part of the same transaction."

71 T.C. at 741. The plurality treated as "irrelevant" the 8 percent of Hartford's stock purchased for cash, although the opinion left somewhat ambiguous the question whether the 8 percent was irrelevant because of the 14-month time interval separating the transactions or because the statute was not concerned with transactions over and above those mathematically necessary to the acquiring corporation's attainment of control.[15]

## II.

■ For reasons set forth extensively in section III of this opinion, we do not accept

---

14. The Tax Court plurality's attempts to distinguish *Howard* will be discussed in Part III D *infra*. The concurring judges forthrightly recognized that the present case—at least as it stands on the *motion for summary judgment*—is indistinguishable from *Howard* on any material ground. *See* 71 T.C. at 742–43 (Scott, J., concurring).

15. If the holding rested on the former basis, it would be difficult to credit the Tax Court's repeated assertions that it was not reaching or deciding the severability issue. As the taxpayers conceded their cash purchases were "parts of the 1970 exchange offer reorganization," the Tax Court had no reason to consider the actual lapse of time which occurred as a factor in treating the cash purchases as legally irrelevant. We assume, therefore, that any indications in the Tax Court's opinion that the separation in time was necessary to its holding were inadvertent, and that the holding actually rests on the Tax Court's reading of the statute. If the Tax Court wishes explicitly to articulate a rule regarding the time period which will suffice to separate two transactions for purposes of Section 368(a)(1)(B), we think it will have an adequate opportunity to do so in considering on remand the issue of severability raised by taxpayers' first argument.

the position adopted by the Tax Court.[16] Instead we side with the Commissioner on the narrow issue presented in this appeal, that is, the correctness of taxpayers' so-called "second" argument premised on an assumed relationship between the cash and stock transactions. As explained below, we find a strong implication in the language of the statute, in the legislative history, in the regulations, and in the decisions of other courts that cash purchases which are concededly "parts of" a stock-for-stock exchange must be considered constituent elements of the "acquisition" for purposes of applying the "solely for . . . voting stock" requirement of Section 368(a)(1)(B). We believe the presence of non-stock consideration in such an acquisition, regardless of whether such consideration is necessary to the gaining of control, is inconsistent with treatment of the acquisition as a nontaxable reorganization. It follows for purposes of taxpayers' second argument— which was premised on the assumption that the cash transactions were part of the 1970 exchange offer reorganization—that the stock transfers in question would not qualify for nonrecognition of gain or loss.

Our decision will not, unfortunately, end this case. The Tax Court has yet to rule on taxpayers' "first" argument. To be sure, appellees urge that in the event of our reversing the Tax Court on the single issue it chose to address, we should consider upholding its judgment on the alternative ground that the prior cash purchases in the instant case were, as a matter of law, unrelated to the exchange offer. The taxpayers are correct that an appellee may urge any contention appearing in the record in support of the decree, whether or not the issue was addressed by the lower court. *Massachusetts Mutual Life Insurance Co. v. Ludwig*, 426 U.S. 479, 480–81, 96 S.Ct. 2158, 2159, 48 L.Ed.2d 784 (1976) (per curiam); *United States v. American Railway Express Co.*, 265 U.S. 425, 435, 44 S.Ct. 560, 563, 68 L.Ed. 1087 (1924). Taxpayers' so-called first argument deserves, however, a more focused and deliberate inquiry than we can give it in the present posture of the case. The Commissioner has briefed the issue in only a cursory fashion, and oral argument was devoted almost entirely to the treatment of cash and stock transactions which, while separate, were conceded to be a part of one another. The question of what factors should determine, for purposes of Section 368(a)(1)(B), whether a given cash purchase is truly "related" to a later exchange of stock requires further consideration by the Tax Court, as does the question of the application of those factors in the present case. We therefore will remand this case to the Tax Court for further proceedings on the question raised by the taxpayers' first argument in support of their motion for summary judgment.

We view the Tax Court's options on remand as threefold. It can hold that the cash and stock transactions here in question are related as a matter of law—the position

---

16. Taxpayers in this case have also argued that we should adopt the reasoning of the district court in *Pierson v. United States*, 472 F.Supp. 957 (D.Del.1979), another case arising on these same facts. The plaintiff in *Pierson* paid the tax assessed by the IRS after it revoked its private letter ruling, and then sued in district court for a refund, advancing substantially the same arguments presented to the Tax Court. The *Pierson* court reached a result similar to the Tax Court's, although it seemed less concerned with attempts to distinguish prior case law on this point. The district court appears to have assumed, for example, that the Tax Court's decision in *Reeves* overruled *Howard v. Commissioner*, 24 T.C. 792 (1955). 472 F.Supp. at 966. The *Pierson* court also assumed, for purposes of taxpayer's motion for summary judgment, that the taxpayer was conceding

that the cash purchases were part of the "same transaction" as the 1970 exchange offer. The district court therefore stated its holding as follows:

"I conclude that at least where eighty percent of the stock of an acquired corporation is exchanged in a single transaction for voting stock in the acquiring corporation, the payment within the same transaction of cash or other nonstock consideration for additional shares in the acquired corporation will not preclude the transaction's qualification as a tax-free reorganization under Section 368(a)(1)(B) of the Internal Revenue Code." 472 F.Supp. at 975. We are given to understand by the parties to this appeal that the *Pierson* case is being appealed in the Third Circuit.

urged by the Commissioner—in which case, under our present holding, there would not be a valid (B) reorganization. On the other hand, the Tax Court may find that the transactions are as a matter of law unrelated, so that the 1970 exchange offer was simply the final, nontaxable step in a permissible creeping acquisition. Finally, the court may decide that, under the legal standard it adopts, material factual issues remain to be decided, so that a grant of summary judgment would be inappropriate at this time.[17]

### III.

### A.

Having summarized in advance our holding, and its intended scope, we shall now revert to the beginning of our analysis, and, in the remainder of this opinion, describe the thinking by which we reached the result just announced. We begin with the words of the statute itself. The reorganization definitions contained in Section 368(a)(1) are precise, technical, and comprehensive. They were intended to define the exclusive means by which nontaxable corporate reorganizations could be effected. See Treas. Reg. § 1.368–1 (1960); 3 J. Mertens, The Law of Federal Income Taxation § 20.86 at 364 (1972). In examining the language of the (B) provision,[17A] we discern two possible meanings. On the one hand, the statute could be read to say that a successful reorganization occurs whenever Corporation X exchanges its own voting stock for stock in Corporation Y, and, immediately after the transaction, Corporation X controls more than 80 percent of Y's stock. On this reading, purchases of shares for which any part of the consideration takes the form of "boot" should be ignored, since the definition is only concerned with transactions which meet the statutory requirements as to consideration and control. To take an example, if Corporation X bought 50 percent of the shares of Y, and then almost

---

**17.** We do not intend to dictate to the Tax Court what legal standard it should apply in determining whether these transactions are related. We would suggest, however, that the possibilities should include at least the following; perhaps others may be developed by counsel or by the Tax Court itself.

One possibility—advanced by the taxpayers—is that the only transactions which should be considered related, and so parts of "the acquisition," are those which are included in the formal plan of reorganization adopted by the two corporations. The virtues of this approach—simplicity and clarity—may be outweighed by the considerable scope it would grant the parties to a reorganization to control the tax treatment of their formal plan of reorganization by arbitrarily including or excluding certain transactions. A second possibility—urged by the Commissioner—is that all transactions sharing a single acquisitive purpose should be considered related for purposes of Section 368(a)(1)(B). Relying on an example given in the legislative history, see S.Rep.No. 1622, 83d Cong., 2d Sess. 273, reprinted in [1954] U.S.Code Cong. & Admin.News, pp. 4621, 4911 [hereinafter cited as 1954 Senate Report], the Commissioner would require a complete and thoroughgoing separation, both in time and purpose, between cash and stock acquisitions before the latter would qualify for reorganization treatment under subsection (B).

A third possible approach, lying somewhere between the other two, would be to focus on the mutual knowledge and intent of the corporate parties, so that one party could not suffer adverse tax consequences from unilateral activities of the other of which the former had no notice. Cf. Manning, "In Pursuance of the Plan of Reorganization": The Scope of the Reorganization Provisions of the Internal Revenue Code, 72 Harv.L.Rev. 881, 912–13 (1959). Such a rule would prevent, for example, the situation where the acquiree's shareholders expect to receive favorable tax treatment on an exchange offer, only to learn later that an apparently valid (B) reorganization has been nullified by anonymous cash purchases on the part of the acquiring corporation. See Bruce v. Helvering, 64 App.D.C. 192, 76 F.2d 442 (D.C. Cir. 1935), rev'g, 30 B.T.A. 80 (1934).

Difficulties suggest themselves with each of these rules, and without benefit of thorough briefing and argument, as well as an informed decision by the lower court, we are reluctant to proceed further in exploring this issue. We leave to the Tax Court the task of breaking ground here.

**17A.** A (B) reorganization is defined in pertinent part as:

"the acquisition by one corporation, in exchange solely for all or a part of its voting stock . . . of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation (whether or not such acquiring corporation had control immediately before the acquisition)."

immediately exchanged part of its voting stock for the remaining 50 percent of Y's stock, the question would arise whether the second transaction was a (B) reorganization. Arguably, the statute can be read to support such a finding. In the second transaction, X exchanged only stock for stock (meeting the "solely" requirement), and after the transaction was completed X owned Y (meeting the "control" requirement).

The alternative reading of the statute—the one which we are persuaded to adopt—treats the (B) definition as prescriptive, rather than merely descriptive. We read the statute to mean that the entire transaction which constitutes "the acquisition" must not contain any nonstock consideration if the transaction is to qualify as a (B) reorganization. In the example given above, where X acquired 100 percent of Y's stock, half for cash and half for voting stock, we would interpret "the acquisition" as referring to the entire transaction, so that the "solely for . . . voting stock" requirement would not be met. We believe if Congress had intended the statute to be read as merely descriptive, this intent would have been more clearly spelled out in the statutory language.[18]

We recognize that the Tax Court adopted neither of these two readings. For reasons to be discussed in connection with the legislative history which follows, the Tax Court purported to limit its holding to cases, such as this one, where more than 80 percent of the stock of Corporation Y passes to Corporation X in exchange solely for voting stock. The Tax Court presumably would assert that the 50/50 hypothetical posited above can be distinguished from this case, and that its holding implies no view as to the hypothetical. See 71 T.C. at 742. The plurality opinion recognized that the position it adopted creates no small problem with respect to the proper reading of "the acquisition" in the statutory definition. See 71 T.C. at 739, 741. In order to distinguish the 80 percent case from the 50 percent case, it is necessary to read "the acquisition" as referring to at least the amount of stock constituting "control" (80 percent) where related cash purchases are present. Yet the Tax Court recognized that "the acquisition" cannot always refer to the conveyance of an 80 percent bloc of stock in one transaction, since to do so would frustrate the intent of the 1954 amendments to permit so-called "creeping acquisitions."[19]

The Tax Court's interpretation of the statute suffers from a more fundamental defect, as well. In order to justify the limitation of its holding to transactions involving 80 percent or more of the acquiree's stock, the Tax Court focused on the *passage* of control as the primary requirement of the (B) provision. This focus is misplaced. Under the present version of the statute, the *passage* of control is entirely irrelevant; the only material requirement is that the acquiring corporation *have* control immediately after the acquisition. As the statute explicitly states, it does not matter if the

18. For example, Congress could have used the word "any" rather than the word "the" before "acquisition" in the first line of the (B) definition. This would have tended to negate the implication that this definition prescribes the conditions a transaction *must* meet to qualify, rather than simply describing that part of a transaction which is entitled to the statutory tax deferral.

19. For a more complete discussion of "creeping acquisitions," see Part III B *infra. See also* Vernava, *The Howard and Turnbow Cases and the "Solely" Requirement of B Reorganizations,* 20 Tax L.Rev. 387, 409–13 (1965). In the typical creeping acquisition situation, Corporation X acquires a portion of Corporation Y's stock, let us say 40 percent, for cash or other nonstock consideration. If (B) reorganizations were limited to those encompassing 80 percent or more of Y's stock in one transaction, X would thereafter be barred, as a practical matter, from acquiring the remainder of Y's shares in a tax-free (B) reorganization. The 1954 Code, however, clearly permits X to trade voting stock for 40 percent or more of Y's remaining stock so long as the stock acquisition is sufficiently separated from the prior cash purchase. *See 1954 Senate Report, supra* note 17 at 273. In these circumstances, therefore, "the acquisition" must be interpreted as referring to an amount of stock less than 80 percent. *See* Comment, *The "Solely for Voting Stock" Requirement of B Reorganizations: Reeves v. Commissioner,* 79 Colum.L.Rev. 774, 799–802 (1979) [hereinafter cited as *Columbia Comment*].

acquiring corporation already has control before the transaction begins, so long as such control exists at the completion of the reorganization. Whatever talismanic quality may have attached to the *acquisition of control* under previous versions of the Code, see Part III B *infra*, is altogether absent from the version we must apply to this case. In our view, the statute should be read to mean that the related transactions that constitute "the acquisition," whatever percentage of stock they may represent, must meet both the "solely for voting stock" and the "control immediately after" requirements of Section 368(a)(1)(B). Neither the reading given the statute by the Tax Court, nor that proposed as the first alternative above, adequately corresponds to the careful language Congress employed in this section of the Code.

### B.

The 1924 Code defined reorganization, in part, as "a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation)." Pub.L.No. 68–176, c. 234, § 203(h)(1), 43 Stat. 257. Although the statute did not specifically limit the consideration that could be given in exchange for stock or assets, courts eventually developed the so-called "continuity of interest" doctrine, which held that exchanges that did not include some quantum of stock as consideration were ineligible for reorganization treatment for lack of a continuing property interest on the part of the acquiree's shareholders. *See, e. g., Cortland Specialty Co. v. Commissioner*, 60 F.2d 937, 939–40 (2d Cir. 1932), *cert. denied*, 288 U.S. 599, 53 S.Ct. 316, 77 L.Ed. 975 (1933); *Pinellas Ice Co. v. Commissioner*, 287 U.S. 462, 470, 53 S.Ct. 257, 260, 77 L.Ed. 428 (1933).

Despite this judicial development, sentiment was widespread in Congress that the reorganization provisions lent themselves to abuse, particularly in the form of so-called "disguised sales." *See, e. g.,* "Prevention of Tax Avoidance," Report of Subcomm. of House Comm. on Ways and Means, 73d Cong., 2d Sess. (Dec. 4, 1933). In 1934, the House Ways and Means Committee proposed abolition of the stock-acquisition and asset-acquisition reorganizations which had appeared in the parenthetical section of the 1924 Act quoted above. *See* H.R.Rep.No. 704, 73d Cong., 2d Sess. 12–14 (1939–1 Cum. Bull. (Part 2) 554, 563–65). The Senate Finance Committee countered with a proposal to retain these provisions, but with "restrictions designed to prevent tax avoidance." S.Rep.No. 558, 73d Cong., 2d Sess. 15 (1939–1 Cum.Bull. (Part 2) 586, 598).[20] One of these restrictions was the requirement that the acquiring corporation obtain at least .80 percent, rather than a bare majority, of the stock of the acquiree. The second requirement was stated in the Senate Report as follows: "the acquisition, whether of stock or of substantially all the properties, must be in exchange solely for the voting stock of the acquiring corporation." *Id.* at 17. The Senate amendments were enacted as Section 112(g)(1) of the Revenue Act of 1934, 48 Stat. 680, which provided in pertinent part:

"(1) The term 'reorganization' means (A) a statutory merger or consolidation, or (B) the acquisition by one corporation in exchange solely for all or a part of its voting stock: of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation; or of substantially all the properties of another corporation . . . ."

Congress revised this definition in 1939 in response to the Supreme Court's decision in *United States v. Hendler*, 303 U.S. 564, 58 S.Ct. 655, 82 L.Ed. 1018 (1938), which held that an acquiring corporation's assumption

---

**20.** The Senate's purpose in retaining these provisions was apparently to make available an alternative to statutory merger or consolidation in those states where merger statutes were overly restrictive or nonexistent. *See Howard v. Commissioner*, 238 F.2d 943, 946 (7th Cir. 1956).

of the acquiree's liabilities in an asset-acquisition was equivalent to the receipt of "boot" by the acquiree. Since virtually all asset-acquisition reorganizations necessarily involve the assumption of the acquiree's liabilities, a literal application of the "solely for . . . voting stock" requirement would have effectively abolished this form of tax-free reorganization. In the Revenue Act of 1939, Congress separated the stock-acquisition and asset-acquisition provisions in order to exempt the assumption of liabilities in the latter category of cases from the "solely for . . . voting stock" requirement.[21] Section 112(g)(1) of the revised statute then read, in pertinent part, as follows:

"(1) the term 'reorganization' means (A) a statutory merger or consolidation, or (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation, or (C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation, but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to liability, shall be disregarded . . . ."

The next major change in this provision occurred in 1954. In that year, the House Bill, H.R. 8300, would have drastically altered the corporate reorganization sections of the Tax Code, permitting, for example, both stock and "boot" as consideration in a corporate acquisition, with gain recognized only to the extent of the "boot." See H.R. Rep.No. 1337, 83d Cong., 2d Sess. A118–A119, A132–A134, reprinted in [1954] U.S. Code Cong. & Admin.News, pp. 4017, 4256–4257, 4269–4271. The Senate Finance Committee, in order to preserve the familiar terminology and structure of the 1939 Code,

proposed a new version of Section 112(g)(1), which would retain the "solely for . . . voting stock" requirement, but alter the existing control requirement to permit so-called "creeping acquisitions." Under the Senate Bill, it would no longer be necessary for the acquiring corporation to obtain 80 percent or more of the acquiree's stock in one "reorganization." The Senate's proposal permitted an acquisition to occur in stages; a bloc of shares representing less than 80 percent could be added to earlier acquisitions, regardless of the consideration given earlier, to meet the control requirement. The Report of the Senate Finance Committee gave this example of the operation of the creeping acquisition amendment:

"[C]orporation A purchased 30 percent of the common stock of corporation W (the only class of stock outstanding) for cash in 1939. On March 1, 1955, corporation A offers to exchange its own voting stock, for all the stock of corporation W tendered within 6 months from the date of the offer. Within the 6 months period corporation A acquires an additional 60 percent of the stock of W for its own voting stock. As a result of the 1955 transactions, corporation A will own 90 percent of all of corporation W's stock. No gain or loss is recognized with respect to the exchanges of the A stock for the W stock."

1954 Senate Report, supra note 17, at 273, U.S.Code Cong. & Admin.News 1954, p. 4911. See also Treas.Reg. § 1.368–2(c) (1960).

At the same time the Senate was revising the (B) provision, (while leaving intact the "solely for . . . voting stock" requirement), it was also rewriting the (C) provision to explicitly permit up to 20 percent of the consideration in an asset acquisition to take the form of money or other nonstock property. See 26 U.S.C. § 368(a)(2)(B). The Senate revisions of subsections (B) and (C) were ultimately passed, and have remained largely unchanged since 1954. (See

21. Section 213 of the Act, 53 Stat. 862, amended Section 112(g)(1) of the new Internal Revenue Code of 1939 to accomplish this result.

footnote 1 for present text.) Proposals for altering the (B) provision to allow "boot" as consideration have been made, but none has been enacted.[22]

As this history shows, Congress has had conflicting aims in this complex and difficult area. On the one hand, the 1934 Act evidences a strong intention to limit the reorganization provisions to prevent forms of tax avoidance that had proliferated under the earlier revenue acts. This intention arguably has been carried forward in the current versions through retention of the "solely for . . . voting stock" requirement in (B), even while the (C) provision was being loosened. On the other hand, both the 1939 and 1954 revisions represented attempts to make the reorganization procedures more accessible and practical in both the (B) and (C) areas. In light of the conflicting purposes, we can discern no clear Congressional mandate in the present structure of the (B) provision, either in terms of the abuses sought to be remedied or the beneficial transactions sought to be facilitated. At best, we think Congress has drawn somewhat arbitrary lines separating those transactions that resemble mere changes in form of ownership and those that contain elements of a sale or purchase arrangement. In such circumstances we believe it is more appropriate to examine the specific rules and requirements Congress enacted, rather than some questionably delineated "purpose" or "policy," to determine whether a particular transaction qualifies for favorable tax treatment.

To the extent there is any indication in the legislative history of Congress' intent with respect to the meaning of "acquisition" in the (B) provision, we believe the intent plainly was to apply the "solely" requirement to all related transactions. In those statutes where Congress intended to

---

**22.** *See, e. g.*, H.R.Rep.No. 4459, 86th Cong., 1st Sess. § 26 (1959). *See also Columbia Comment, supra* note 19, at 798 & n.169. Furthermore, the legislative report accompanying a later revision of Section 368(a)(1) explicitly stated that cash is not permitted in a (B) reorganization:

"[I]n order to qualify as a tax-free stock-for-stock [B] reorganization it is necessary that the acquisition be *solely* for voting stock and that no stock be acquired for cash or other consideration." (Emphasis in original.)

S.Rep.No. 1533, 91st Cong., 2d Sess. 2–3, *reprinted in* [1970] U.S.Code Cong. & Admin. News, pp. 6123, 6123–24. *See also Columbia Comment, supra*, at 798–99.

It is also noted that a 1958 Advisory Group to the House Ways and Means Committee recommended certain changes in the (B) and (C) provisions which would have permitted up to a third of the consideration in a tax-free exchange to take the form of "boot." *See Revised Report on Corporate Distributions and Adjustments: Hearings Before the House Comm. on Ways and Means*, 86th Cong., 1st Sess. 473, 553–57 (1959). The recommendations of this report were not adopted. In the course of its report, the Advisory Group noted that "[b]oth under the 1939 Code and the 1954 Code there has been doubt as to the extent to which the statute requires in a 368(a)(1)(B) reorganization (stock-for-stock acquisition) that each of the stock acquisitions be made by the acquiring corporation solely for its voting stock." *Id.* at 555. After discussing the "creeping acquisition" amendment of 1954, the Group stated:

"There remains some doubt . . . as to whether if in [the same year] some stock was acquired from certain stockholders solely for cash and other stock was acquired from other stockholders solely for voting stock, the transaction qualifies for non-recognition of gain or loss in the case of those shareholders who exchanged their stock solely for voting stock. This was the problem involved in the *Howard* case, [238 F.2d 943 (7th Cir. 1956)], in which the court held that the transaction did not qualify as a reorganization under the 1939 Code . . . ."

*Id.* at 556. While this report seemed to express some doubt about the outcome in *Howard*, *compare* discussion in Part III D *infra*, we find it noteworthy that Congress never acted on the report's recommendations for altering the statute. Moreover, the report went on to indicate that its point of view probably did not represent the view embodied in the statute:

"Under the proposed revision of section 368(a)(1)(B) it would be possible for the acquiring corporation to acquire part of a controlling interest in another corporation in stock-for-stock exchanges with some stockholders and the balance by cash purchases from other stockholders, all as a part of the same plan. . . . [*T*]*his probably represents an extension beyond the present (B) reorganization concepts.*" (Emphasis added.)

*Id.* at 556. We have been directed to no instance in which Congress has suggested—directly or indirectly—that cash or other "boot" is permissible in a (B) reorganization.

permit cash or other property to be used as consideration, it made explicit provision therefor. *See, e. g.,* 26 U.S.C. § 368(a)(2)(B). It is argued that in a (B) reorganization the statute can be satisfied where only 80 percent of the acquiree's stock is obtained solely for voting stock, so that additional acquisitions are irrelevant and need not be considered. In light of Congress' repeated, and increasingly sophisticated, enactments in this area, we are unpersuaded that such an important question would have been left unaddressed had Congress intended to leave open such a possibility. We are not prepared to believe that Congress intended—either when it enacted the 1934, the 1939, or the 1954 statutes—to permit a corporation to exchange stock tax-free for 80 percent of the stock of another and in a related transaction to purchase the remaining 20 percent for cash. The only question we see clearly left open by the legislative history is the degree of separation required between the two transactions before they can qualify as a creeping acquisition under the 1954 amendments. This is precisely the issue the Tax Court chose not to address, and it is the issue we now remand to the Tax Court for consideration.

### C.

Besides finding support for the IRS position both in the design of the statute and in the legislative history, we find support in the regulations adopted by the Treasury Department construing these statutory provisions. We of course give weight to the statutory construction contemporaneously developed by the agency entrusted by Congress with the task of applying these laws. *See, e. g., Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933); *Edwards' Lessee v. Darby,* 25 U.S. (12 Wheat.) 206, 210, 6 L.Ed. 603 (1827); 2 K. Davis, Administrative Law Treatise § 7:14 (2d ed. 1979). The views of the Treasury on tax matters, while by no means definitive, undoubtedly reflect a familiarity with the intricacies of the tax code that surpasses our own.

Appellees point to language appearing in the regulations under the 1934 Act which seems to them to suggest that only the 80 percent of stock essential for control must meet the "solely" requirement:

> "In order to qualify as a 'reorganization' under section 112(g)(1)(B), the acquisition by the acquiring corporation of the *required amount* of the stock of the other corporation must be in exchange solely for all or a part of the voting stock of the acquiring corporation. If for example Corporation X exchanges nonvoting preferred stock or bonds in addition to all or part of its voting stock in the acquisition of the *required amount* of stock in Corporation Y, the transaction is not a 'reorganization' under section 112(g)(1)(B)."

Reg. 111, § 29.112(g)–2 (emphasis supplied). While it is possible to read the "required amount" language as equivalent to the "80 per centum" requirement of the 1934 Act, we find it equally plausible to read the language as simply reiterating the "*at least* 80 per centum" notion. In other words, the "required amount" does not mean that only 80 percent of the exchange need be for stock, but rather means that the bloc of shares constituting no less than 80 percent—and possibly more—must *all* be exchanged for stock only. *See Howard v. Commissioner,* 238 F.2d 943, 945 (7th Cir. 1956).

When we turn to the regulations under the 1954 Act, the implication that the entire transaction must be judged under the "solely" test is stronger still.

> "In order to qualify as a 'reorganization' under section 368(a)(1)(B), the *acquisition* by the acquiring corporation of stock of another corporation must be in exchange solely for all or a part of the voting stock of the acquiring corporation . . . and the acquiring corporation must be in control of the other corporation immediately after *the transaction.* If, for example, Corporation X in one transaction exchanges nonvoting preferred stock or bonds *in addition to* all or a part of its voting stock in the acquisition of stock of Corporation Y, the transaction is not a

reorganization under section 368(a)(1)(B)." (Emphasis supplied.) Treas.Reg. § 1.368–2(c) (1960). The equation of "transaction" and "acquisition" in the above-quoted passage is particularly significant, since it seems to imply a functional test of what constitutes "the acquisition" as opposed to a view of "the acquisition" as simply that part of a transaction which otherwise satisfies the statutory requisites.[23] The regulation also goes on to say, in explaining the treatment of creeping acquisitions:

> "The acquisition of stock of another corporation by the acquiring corporation solely for its voting stock . . . is permitted tax-free even though the acquiring corporation already owns some of the stock of the other corporation. Such an acquisition is permitted tax-free in a single transaction or in a series of transactions taking place over a relatively short period of time such as 12 months."

Treas.Reg. § 1.368–2(c).[24] This regulation spells out the treatment afforded related acquisitions, some of which occur before and some after the acquiring corporation obtains the necessary 80 percent of stock in the acquiree. It would be incongruous, to say the least, if a series of stock-for-stock transactions could be combined so that the tax-free treatment of later acquisitions applied to earlier ones as well, yet a related cash purchase would be ignored as irrelevant. This section reinforces our view that all related transactions must be considered part of "the acquisition" for purposes of applying the statute.

### D.

Finally, we turn to the body of case law that has developed concerning (B) reorganizations to determine how previous courts have dealt with this question. Of the seven prior cases in this area, all to a greater or lesser degree support the result we have reached, and none supports the result reached by the Tax Court. We recognize that the Tax Court purported to distinguish these precedents from the case before it, and that reasonable persons may differ on the extent to which some of these cases directly control the question raised here. Nevertheless, after carefully reviewing the precedents, we are satisfied that the decision of the Tax Court represents a sharp break with the previous judicial constructions of this statute, and a departure from the usual rule of stare decisis, which applies with special force in the tax field where uncertainty and variety are ordinarily to be avoided.

Of the seven precedents, the most significant would seem to be *Howard v. Commissioner*, 238 F.2d 943 (7th Cir. 1956), *rev'g*, 24 T.C. 792 (1955), which stands out as the one case prior to *Reeves* that specifically addressed the issue raised herein. In *Howard*, the Truax-Traer Coal Company acquired 80.19 percent of the outstanding stock of Binkley Coal Company solely in exchange for Truax-Traer voting stock. At the same time and as part of the same plan of acquisition, Truax-Traer purchased the other 19.-81 percent of Binkley's stock for cash. The taxpayers, former shareholders of Binkley who had exchanged their shares solely for voting stock, sold some of the Truax-Traer stock they had received in August 1950, the same year as the exchange. The Commissioner, treating the exchange as a taxable event and not a reorganization, employed a

---

**23.** Furthermore, the regulation explicitly states that the presence of "boot" in addition to stock as consideration would prevent treatment of the transaction as a (B) reorganization. This language is not wholly dispositive, however; it could be read as reaching only cases where "boot" was present in the consideration given for each share exchanged. It is clear that the "solely for . . . voting stock" requirement prevents stock acquired for such "mixed" consideration from qualifying for reorganization treatment. The "in addition to" language in the regulation could be construed as reaching only this situation, and not the contrasting case where Corporation X acquires 80 percent of Y's stock solely for voting stock and another separate 20 percent for some other consideration. The *Reeves* case is, of course, of the latter type; with respect to every single share transferred, the consideration was either wholly in stock or wholly in cash.

**24.** *Compare Commissioner v. Gordon*, 391 U.S. 83, 88 S.Ct. 1517, 20 L.Ed.2d 448 (1968).

new holding period, beginning with the effective date of the exchange, and treated the taxpayers' gain on their sale of the Truax-Traer stock as a short-term capital gain. The Tax Court sustained the Commissioner, concluding the exchange had not been made "solely for . . . voting stock," as required by the 1939 Act, even though the cash purchases were not essential to Truax-Traer's acquisition of control. 24 T.C. at 804.[25]

The Seventh Circuit, after reviewing the legislative history of Section 112(g)(1)(B) of the 1939 Code, agreed with the Tax Court's conclusion that the presence of cash purchases prevented the transaction from meeting the "solely" requirement of the statute. Like the Tax Court, the court of appeals relied heavily on two prior decisions arising in slightly different contexts. The principal linchpin of the Seventh Circuit's decision was *Helvering v. Southwest Consolidated Corp.*, 315 U.S. 194, 62 S.Ct. 546, 86 L.Ed. 789 (1942), in which the Supreme Court denied tax-free treatment to an asset acquisition under the 1934 Act because a substantial amount of the consideration was given in the form of stock warrants and cash. The Court first noted that under the law existing before 1934, this transaction would have been a perfectly valid tax-free reorganization. The revised statute, *see* text at notes 20–21 *supra*, had made the continuity of interest test much stricter, however:

"Congress has provided that the assets of the transferor corporation must be acquired in exchange 'solely' for 'voting stock' of the transferee. 'Solely' leaves no leeway. Voting stock plus some other consideration does not meet the statutory requirement."

315 U.S. at 198, 62 S.Ct. at 550. The Seventh Circuit noted that in the 1934 Act the asset and stock acquisition reorganizations were dealt with in the same clause both in the statutory language and in the legislative history. It therefore seemed reasonable to the Seventh Circuit to conclude that the Supreme Court's "no leeway" rule for asset acquisitions applied with equal force to stock acquisitions.

Appellees argue that *Southwest Consolidated* is distinguishable from the present facts, and, implicitly, that it should not have been relied on by the *Howard* court. This argument rests, in our view, on a strained reading of *Southwest Consolidated*. The taxpayers point out that the nonstock consideration in that case amounted to 37 percent of the total consideration, by the Tax Court's reckoning. Further, they say that the stock and nonstock consideration could not be separated where one bundle of assets was exchanged for one bundle of consideration, so that *Southwest Consolidated* was essentially a mixed consideration case. We disagree. Had the Supreme Court chosen

25. The Tax Court's decision consisted of two findings. The first concerned the issue of whether the two transactions were related:

"We think it clear that each element and term of the plan and agreement as originated, outlined, and consummated was inseparably interrelated, and designed to accomplish but one purpose, the acquisition by Truax-Traer of . . . Binkley . . . . Accordingly, there can be no doubt that petitioners did not take part in an exchange of some Binkley stock for stock of Truax-Traer and a separate and unrelated sale of other shares of Binkley stock . . . to Truax-Traer."

*Id.* at 802. The second finding specifically addressed the issue before this court:

"Basically the question before us is whether the statute requires all . . . stock acquired . . . to have been acquired only ('solely') for stock, or whether it is sufficient if a minimum of ('at least') 80 per cent

. . . was acquired for . . . stock even though the remainder . . . was . . . acquired for a consideration other than stock . . . . We recognize that there is force to petitioner's argument that the practical objectives of the statute might well be satisfied if we were to adopt the construction urged. We think, however, that the authorities have clearly established the applicable rule of law to be that the consideration for whatever stock is acquired by the transferee corporation in a transaction such as that before us must be solely the transferee's voting stock, and nothing else."

*Id.* at 804. The authorities cited by the Tax Court included *Helvering v. Southwest Consolidated Corp.*, 315 U.S. 194, 62 S.Ct. 546, 86 L.Ed. 789 (1942), and *Commissioner v. Air Reduction Co.*, 130 F.2d 145 (2d Cir.), *cert. denied*, 317 U.S. 681, 63 S.Ct. 201, 87 L.Ed. 546 (1942), both discussed *infra*.

to decide the issue of whether "substantially all" the assets of one corporation were obtained solely for voting stock, it could have allocated the consideration on a proportional basis, much as the Tax Court did in making its calculations.[26] The Supreme Court did not consider, however, whether the voting stock consideration was sufficient to cover "substantially all" the assets, so that Section 112(g)(1)(B) would be satisfied. The Court determined rather that the presence of *any* nonstock consideration in the acquisition negated the possibility of a valid tax-free reorganization. While the facts were such that the Court could have reached the same result on another rationale, this does not detract from the weight of its words. The Seventh Circuit was, in our opinion, justified in resting its holding by analogy on the decision in *Southwest Consolidated*.[27]

The other case principally relied on by the *Howard* court was *Commissioner v. Air Reduction Co.*, 130 F.2d 145 (2d Cir.), *cert. denied*, 317 U.S. 681, 63 S.Ct. 201, 87 L.Ed. 546 (1942). On January 1, 1935, Air Reduction Co. already owned 95,181 shares of stock in the Pure Carbonic Company, of which 87,275 had been acquired in exchange for Air Reduction stock and 7,906 had been bought for cash. During 1935, Air Reduction acquired 100 percent ownership of Carbonic by purchasing 14,771 shares for cash and exchanging 5,258 shares of its own treasury stock for the remaining 22,347 shares of Carbonic stock. Altogether, about 82 percent of Carbonic's stock was acquired solely for shares of Air Reduction stock. Air Reduction principally argued that it could not have recognized gain on trading in its own treasury stock, an argument the court rejected. In a separate argument, raised for the first time on appeal, the company asserted that the stock

acquisition constituted a nontaxable reorganization. The Second Circuit rejected this argument as well:

> "[T]his theory is not tenable because the definition of reorganization in § 112(g)(1)(B) of the 1934 Act . . . contemplates only situations where the exchange is made 'solely' for voting stock. Here over 17% of the Pure Carbonic stock was purchased for cash. Cf. *Helvering v. Southwest Consolidated Corp.* . . . ."

130 F.2d at 148. The Second Circuit, from its language, evidently would not have approved a transaction where, as here, more than 8 percent of the acquiree's stock was purchased for cash. The fact that more than 80 percent of Pure Carbonic's stock, a sufficient amount for control, was acquired solely for stock was not considered determinative.

The Tax Court, in addition to casting aspersions on the Second Circuit's judicial craftsmanship ("the question was a subsidiary one and may not have attracted much attention" 71 T.C. at 738 n.15), asserted that *Air Reduction* was factually distinguishable because it did not involve a single, readily identifiable transaction in which control was passed solely for allowable consideration. In the Tax Court's words, it was necessary to "pick and choose" which transactions to consider as leading to control in order to establish that control was acquired solely for voting stock. The Second Circuit made no mention of this aspect of the case, however, nor did it discuss the related issue of whether a reorganization under the 1934 Act could be conducted in stages at all. As the citation to *Southwest Consolidated* makes clear, the Second Circuit took it as settled that *any* appreciable nonstock consideration in a (B) acquisition precludes treatment as a reorganization.[28]

---

26. See discussion in *Columbia Comment, supra* note 19, at 789 n.103.

27. Nor is our view of *Southwest Consolidated* undermined in any way by Congress' subsequent actions liberalizing the asset-acquisition rules under Sections 368(a)(1)(C) and (a)(2)(B) of the 1954 Code. As we have earlier pointed out, *see* Part III B *supra*, this liberalization

actually supports our position, since it indicates that Congress was fully capable of granting leeway where leeway was desired.

28. Similar results were reached in *Pulfer v. Commissioner*, 43 B.T.A. 677 (1941), *aff'd per curiam*, 128 F.2d 742 (6th Cir. 1942), and *Lutkins v. United States*, 312 F.2d 803, 160 Ct.Cl. 648, *cert. denied*, 375 U.S. 825, 84 S.Ct. 65, 11

Besides questioning its lineage, the Tax Court plurality made three attempts to distinguish the *Howard* case or undercut its holding. First, the Tax Court argued that *Howard* was a case in which "some stockholders involved in the one exchange transaction . . . received cash." 71 T.C. at 737. The impact of this distinction is less than clear. There was no finding in *Howard* that any stockholder received both cash and stock for the *same* shares. In both *Howard* and this case, more than 80 percent of the shares were exchanged for stock only, and additional shares were purchased for cash. The only possible meaning of the Tax Court's statement is that it did not consider the 1968–69 cash purchases and the 1970 exchange offer part of "one exchange transaction." Yet the taxpayers' specific concession on motion for summary judgment was that the two events should be assumed to constitute "parts of the 1970 exchange offer reorganization." Nor is the Tax Court's reference to its enigmatic footnote 18 particularly illuminating.[29] We do not see how *Howard* can be distinguished from the present case other than on a finding that the cash and stock transactions here were unrelated as a matter of law, a finding the Tax Court specifically declined to make. (As we are remanding this latter issue to the Tax Court, we take no position on it now.)

The Tax Court's second attack on *Howard*, contained in footnote 12,[30] is equally unpersuasive. The fact that one shareholder of Binkley (the acquiree) received voting stock for some of its shares and cash for other shares, so that the 80 percent necessary for control was not acquired from shareholders receiving only stock, was not relied on by the Seventh Circuit. Furthermore, the focus of the statute is on the consideration furnished in the exchange, not on the consideration received by a particular shareholder. Any rule premised on the consideration each shareholder received would quickly founder on the realities of the stock market. Corporations could rarely assure themselves that an exchange for more than 80 percent of one corporation's stock would not be tainted by some stockholder's withholding of shares to sell to the acquiring corporation through the relative anonymity of market transactions.[31] Indeed, in this case there is no proof that some of ITT's earlier market purchases were not made from shareholders of Hartford who later exchanged other shares for ITT's voting stock. *Compare Pulfer v. Commissioner*, 43 B.T.A. 677, 681 (1941). The Tax Court's rule could only practically provide nontaxable treatment to transactions in which more than 80 percent of *shares* were exchanged for voting stock; a rule that limited the consideration going to *shareholders* would be unenforceable.

The third line of assault on *Howard* is the assertion that the *Howard* decision was cast in doubt by *Turnbow v. Commissioner*, 368 U.S. 337, 82 S.Ct. 353, 7 L.Ed.2d 326 (1961), aff'g, 286 F.2d 669 (9th Cir. 1960). To go back for a moment, in *Howard* the Seventh Circuit affirmed the Tax Court's holding that cash consideration precluded a (B) re-

L.Ed.2d 57 (1963). Both involved creeping acquisitions under the pre-1954 law and in both some of the prior acquisitions were, or may have been, made for nonstock consideration. We acknowledge, as the Tax Court found, that these cases do not stand on all fours with the facts herein, *but see Pierson v. United States*, 472 F.Supp. 957, 966 n.27 (D.Del.1979), and note that, at least in the case of *Pulfer*, a successful reorganization probably would have been found under the 1954 Code. We also agree with the Tax Court that no implication can fairly be drawn that Congress in 1954 implicitly adopted the holdings in *Pulfer* (1941) or *Air Reduction* (1942), since nothing in the legislative history indicates any awareness of these decisions.

**29.** *See* 71 T.C. at 741 n.18; text at note 15 *supra.*

**30.** 71 T.C. at 737 n.12.

**31.** For a discussion of the use of "street names" whereby record title to stock is held by brokers or banks while beneficial ownership is held by someone else, *see In re Franklin National Bank Securities Litigation*, 574 F.2d 662, 664 n.2, 673 (2d Cir. 1978), *modified*, 599 F.2d 1109 (2d Cir. 1979); *cf. In re Viatron Computer Systems Corp. Litigation*, 614 F.2d 11 (1st Cir. 1980).

ganization, but then went on to hold that the taxpayer was nevertheless entitled to nonrecognition of gain on the exchange under Section 112(c)(1) of the 1939 Code (the predecessor of current Section 356(a)(1)).[32] The court reasoned that the Truax-Traer/Binkley exchange would have been an exchange entitled to nontaxable treatment "if it were not for the fact that the property received in exchange consist[ed] not only of property permitted . . . to be received without the recognition of gain, but also of other property or money." 238 F.2d at 947. Therefore, it concluded that Section 112(c)(1) limited recognition of gain to the value of any "boot" received. In *Turnbow*, the Ninth Circuit faced a similar situation—an exchange which had elements of a valid (B) reorganization except for the presence of cash [33]—and reached the opposite conclusion. 286 F.2d at 675. The Supreme Court took jurisdiction to resolve this division in the circuits, and sided with the Ninth Circuit, holding that Section 112(c)(1) only applied to reorganizations where some consideration other than "stock or securities" was otherwise allowed (an example is a statutory merger under subsection (A)). 368 U.S. at 343, 82 S.Ct. at 356.

The argument that *Turnbow* undercuts *Howard's* first holding, even though that holding was not an issue in *Turnbow*, rests on two grounds. First, the Tax Court quoted at length from the government's Supreme Court brief in *Turnbow* [34] where the government, for tactical reasons, argued that some cash might be allowable in a (B) reorganization. The brief also questioned whether the *Howard* decision would survive. Consequently, the Tax Court said, the Supreme Court left open the question decided in *Howard* by limiting its holding to the facts of *Turnbow*, where 70 percent of the consideration was cash. Support for this position is sought in the Supreme Court's statement that "[t]hat holding [70 percent cash is not a valid (B) reorganization] determines this case and is all we decide," 368 U.S. at 344, 82 S.Ct. at 357, and the later statement that "we have no need or occasion to follow the parties into, or to decide, collateral questions." *Id.*

We find the contrary conclusion more persuasive. Although the government had questioned *Howard's* first holding, the Supreme Court indicated no hesitance or doubt with respect to it. Indeed, the Court stated near the outset of its opinion:

32. Section 112(c)(1) of the 1939 Code read:
   "If an exchange would be within the provisions of subsection (b), (1), (2), (3) or (5) . . . if it were not for the fact that the property received in exchange consist[ed] not only of property permitted by such paragraph . . . to be received without recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property."
   Pub.L. No. 1, 76th Cong., 1st Sess., 53 Stat. 39.
   The text of present Section 356(a)(1) appears in footnote 11 *supra*.

33. In *Turnbow*, most of the consideration took the form of "boot," so that the issue raised here did not arise directly. The Ninth Circuit did say:
   "It is clear from the [legislative] history that, with specific abuses in mind, Congress sought to eliminate them by requiring that, for an acquisition to qualify for the tax advantages of a reorganization, it must be in exchange solely for voting stock."
   286 F.2d at 673.

34. "It cannot be said with certainty, for that matter, that there could not be 'other property' in a transaction qualifying as a 'B' or 'C' reorganization. While those definitions do literally require that 'solely * * * voting stock' be given, that requirement raises questions of interpretation (not involved in this case) that have not yet been finally resolved. For example, since sec. 112(g)(1)(B) requires only that 80% of the stock of another corporation be acquired, it is arguable that the definition is met if the consideration allocable to at least 80% of the stock consists of voting stock, notwithstanding that the acquiring corporation also acquires additional shares (e. g., from dissenting stockholders) for money or other property. That was in fact the situation in the *Howard* case, in which the acquiring corporation gave solely voting stock for 81% of the shares but gave cash to a dissenting minority for the remaining 19%. While the Seventh Circuit held that the cash given the minority precluded a 'B' reorganization, the question is a debatable one and there is no assurance that other courts would follow that decision [Brief for Government n.7 at 21.]"
   71 T.C. at 737 n.13.

"There is no dispute between the parties about the fact that the transaction involved was not a 'reorganization' as defined in § 112(g)(1)(B), because 'the acquisition by' Foremost was not 'in exchange *solely* for . . . its voting stock', but was partly for such stock and partly for cash. *Helvering v. Southwest Consolidated Corp.*, 315 U.S. 194, [62 S.Ct. 546, 86 L.Ed. 789.]" (Emphasis in original.)

368 U.S. at 341, 82 S.Ct. at 356.[35] We read no implication here, or anywhere else in the opinion, that the Court felt *Howard* to be an inaccurate statement of the law or that some specific issue was being reserved for later decision. If anything, the citation of *Southwest Consolidated* in connection with the "solely" requirement of subsection (B) would seem to imply that the strict reading of the statute continued to apply to (B) reorganizations even after (B) and (C) were separated in the statute (1939) and after cash of up to 20 percent was permitted in (C) reorganizations (1954).

In short, we find *Howard* factually and legally indistinguishable from *Reeves*, and see no reason to question its continuing vitality. Even were we doubtful as to the correctness of the result reached in *Howard* (and we are not), we would nonetheless be reluctant to see a rule of tax law which has stood virtually unchallenged by courts for 25 years discarded so unceremoniously. As the dissenting judges of the Tax Court noted, much tax planning must proceed on the basis of settled rules. Avoidance of risk and uncertainty are often the keys to a successful transaction. Transactions may have been structured on the basis of *Howard*, with cash intentionally introduced to prevent reorganization treatment. Where a long standing tax rule of this sort is not clearly contrary to Congressional intent or markedly inconsistent with some generally accepted understanding of correct doctrine we think the proper body to make changes aimed at improving the law is Congress, and not the courts. The complex and delicate judgments as to proper tax policy, and the balancing of interests between corporations, their shareholders, and the public, required to formulate appropriate rules in this area are not the proper province of courts. Our role is to interpret the mandate of Congress as best we can, and to adhere to the reasonable standards supplied by our predecessors where possible. Our role is emphatically not to read into the tax law our own notions of "a well-ordered universe." *Compare Pierson v. United States*, 472 F.Supp. 957, 974 (D.Del.1979).

Our reading of the statute is reinforced by another more recent circuit decision as well. In *Mills v. Commissioner*, 331 F.2d 321 (5th Cir. 1964), *rev'g*, 39 T.C. 393 (1962), the issue was whether cash payments for fractional shares in an exchange prevented a nontaxable reorganization. General Gas Corporation, the acquiror, offered the three taxpayers, sole stockholders in three small gas corporations, shares of General common stock in exchange for all of their stock. The number of General shares to be exchanged—at a value of $14 per share—was to be determined by measuring the net book value of the three small corporations. In the event the purchase price was not evenly divisible by 14, cash was to be paid in lieu of fractional shares. As a result, each taxpayer received 1,595 shares of General stock and $27.36 in cash. The Tax Court held this transaction invalid as a tax-free reorganization, declining to adopt a *de minimis* rule. 39 T.C. at 400.[36] The Fifth Circuit agreed that cash could not form any part of the consideration in a (B) reorganization, but concluded in reversing the Tax Court that

---

**35.** The Tax Court inexplicably stated that the *Turnbow* Court never referred to *Southwest Consolidated*. 71 T.C. at 735.

**36.** The Tax Court in *Mills* stated:
"We construe the word 'solely' as meaning precisely what it purports to mean, namely that the receipt by the stockholders of an acquired corporation of any consideration whatsoever other than voting stock forbids a transaction from being a reorganization as defined under section 368(a)(1)(B) . . . . . We cannot assume that Congress was incapable of expressing a grant of leeway when that was its purpose."
39 T.C. at 400.

the fractional-share arrangement was merely a bookkeeping convenience and not an independent part of the consideration. 331 F.2d at 324–25.

Taxpayers, and the Tax Court, argued that *Mills* was distinguishable, despite its sweeping language, because each shareholder of the acquired corporations received both stock and cash in the exchange. We have discussed earlier our reasons for rejecting any rule premised on the consideration received by the acquiree's shareholders. If *Mills* were distinguishable at all, it would be only because the consideration for some of the *shares* in *Mills* consisted of both stock and cash. But even this distinction evaporates when one notes that the one share in each exchange for which a fractional share would have been necessary never constituted more than 20 percent of the stock of any one of the acquiree corporations (since each shareholder held at least six shares in each corporation). In every exchange it was theoretically possible to identify a bloc of more than 80 percent of the stock of the acquiree which was exchanged solely for the voting stock of the acquiring corporation. Thus, in the only case raising the issue now before us under the 1954 Code, the Tax Court accepted as a premise that no cash was permissible as consideration in a (B) reorganization, even where the facts showed that control had passed solely for voting stock.

## IV.

We have stated our ruling, and the reasons that support it. In conclusion, we would like to respond briefly to the arguments raised by the Tax Court, the District Court of Delaware, and the taxpayers in this case against the rule we have reaffirmed today. The principal argument, repeated again and again, concerns the supposed lack of policy behind the rule forbidding cash in a (B) reorganization where the control requirement is met solely for voting stock. It is true that the Service has not pointed to tax loopholes that would be opened were the rule to be relaxed as appellees request. We also recognize, as the Tax Court and others have highlighted, that the rule may produce results which some would view as anomalous. For example, if Corporation X acquires 80 percent of Corporation Y's stock solely for voting stock, and is content to leave the remaining 20 percent outstanding, no one would question that a valid (B) reorganization has taken place. If Corporation X then decides to purchase stock from the remaining shareholders, the *Howard* rule might result in loss of nontaxable treatment for the stock acquisition if the two transactions were found to be related. *See* 71 T.C. at 740–41. The Tax Court asserted that there is no conceivable Congressional policy that would justify such a result. Further, it argued, Congress could not have felt that prior cash purchases would forever ban a later successful (B) reorganization since the 1954 amendments, as the legislative history makes clear, specifically provided that prior cash purchases would not prevent a creeping acquisition.[37]

While not without force, this line of argument does not in the end persuade us. First of all, as already discussed, the language of the statute, and the longstanding interpretation given it by the courts, are persuasive reasons for our holding even in the absence of any clear policy behind Congress' expression of its will. Furthermore, we perceive statutory anomalies of another sort which the Tax Court's rule would only magnify. It is clear from the regulations, for example, that a corporation which already owned as much as 80 percent of another's stock, acquired solely for cash, could in some circumstances acquire all or a part of the remainder solely for voting stock as a valid (B) reorganization.[38] Why, then, could not as little as 10 percent of an acquisition constitute a (B) reorganization, if made solely for voting stock, even though the remaining transactions—totaling more than 80 percent—were made for nonstock consideration? If it is true that Congress did not view related cash transactions as

---

37. *See 1954 Senate Report, supra* note 17, at 273.

38. *See* Treas.Reg. § 1.368–2(c).

tainting a stock-acquisition reorganization, why would it enact a "solely for . . . voting stock" requirement at all, except to the extent necessary to prevent mixed consideration of the sort employed in the "disguised sales" of the twenties?

Possibly, Congress' insertion of the "solely for . . . voting stock" requirement into the 1934 Act was, as one commentator has suggested, an overreaction to a problem which could have been dealt with through more precise and discriminating measures.[39] But we do not think it appropriate for a court to tell Congress how to do its job in an area such as this. If a more refined statutory scheme would be appropriate, such changes should be sought from the body empowered to make them. While we adhere to the general practice of construing statutes so as to further their demonstrated policies, we have no license to rework whole statutory schemes in pursuit of policy goals which Congress has nowhere articulated. Appellees have not shown us any reason to believe that reaffirmation of the settled rule in this area will frustrate the Congressional purpose of making the (B) reorganization provision generally available to those who comply with the statutory requirements.[40]

A second major argument, advanced primarily by the district court in *Pierson*, is that the previous cases construing this statute are suspect because they did not give proper weight to the changes wrought by the 1954 amendments. In particular, the court argued the liberalization of the "boot" allowance in (C) reorganizations and the allowance of creeping (B) acquisitions showed that Congress had no intent or desire to forbid "boot" of up to 20 percent in a (B) reorganization. As we have discussed earlier, we draw the opposite conclusion from the legislative history. Liberalization of the (C) provision shows only that Congress, when it wished to do so, could grant explicit leeway in the reorganization rules. Nor do the creeping acquisition rules mark such a departure from a strict reading of the "solely" requirement as to persuade us that Congress intended to weaken it with respect to related transactions. One has only to look at the illustration given in the legislative history, with its separation of 16 years between the cash and stock transactions, to see that Congress did not indicate positive approval of the type of acquisition covered by the district court's holding.[41]

A third argument asserts that reliance on the literal language of the 1954 Code, and in particular a focus on the interpretation of "acquisition," is unjustified because the 1954 Code was not intended to alter the status of (B) reorganizations under the 1934 and 1939 Codes. According to this argument, the acquisition of at least 80 percent of the acquiree's stock solely for voting stock was allowed under the pre-1954 version, and must still be allowed even though the present statute refers only to "the acquisition . . . of stock" with no percentage specified. This argument assumes the answer to the question that is asked. As *Howard* and *Southwest Consolidated* illustrate, it has been the undeviating understanding of courts, until now, that the pre-1954 statutes did *not* allow cash or other "boot" in a (B) reorganization. It cannot be inferred that Congress left intact a rule which never existed by enacting language inconsistent with such a rule.

---

**39.** *See* Dailey, *The Voting Stock Requirement of B and C Reorganizations*, 26 Tax L.Rev. 725, 731 (1971); *Pierson v. United States*, 472 F.Supp. 957, 968 n.37 (D.Del.1979).

**40.** We do not see how the argument that cash purchases are necessary to buy out the interests of "dissenting shareholders" who decline to take part in the exchange advances taxpayers' cause. One of the purposes of stock-acquisition arrangements, as opposed to statutory mergers, is to provide the option to minority shareholders not to take part. In this case, had such protection not been afforded, the Connect-

icut Insurance Commissioner evidently would not have approved the acquisition.

**41.** We also see little merit in the argument that the IRS policy of granting minor deviations from the "solely for . . . voting stock" requirement for such practical purposes as allowing the acquiring corporation to pay transaction costs undermines the strict reading the IRS urges in this case. *See Pierson*, 472 F.Supp. at 972 n.51. The same is true of revenue rulings permitting purchases of stock indirectly from the acquired corporation itself.

Finally, we see no merit at all in the suggestion that we should permit "boot" in a (B) reorganization simply because "boot" is permitted in some instances in (A) and (C) reorganizations. Congress has never indicated that these three distinct categories of transactions are to be interpreted *in pari materia.* In fact, striking differences in the treatment of the three subsections have been evident in the history of the reorganization statutes.[42] We see no reason to believe a difference in the treatment of "boot" in these transactions is impermissible or irrational.

Accordingly, we vacate the judgment of the Tax Court insofar as it rests on a holding that taxpayers were entitled to summary judgment irrespective of whether the cash purchases in this case were related by purpose or timing to the stock exchange offer of 1970. The case will be remanded to the Tax Court for further proceedings consistent with this opinion.

*Vacated and remanded.*

42. For example, under the 1954 version of the (C) reorganization, voting stock of a parent corporation could be used to acquire assets for a subsidiary. A similar provision was not added to the (B) section until 1964. Revenue Act of 1964, Pub.L.No.88–272, § 218(a), 78 Stat. 57.